70 Cal.Rptr.3d 776 (2008)
159 Cal.App.4th 10
David B. SCHACHTER, Plaintiff and Appellant,
v.
CITIGROUP, INC., et al., Defendants and Respondents.
No. B193713.
Court of Appeal of California, Second District, Division Seven.
January 18, 2008.
*778 Law Offices of Ashley D. Posner, Ashley D. Posner, Sherman Oaks, and Barbara Brudno, Los Angeles, for Plaintiff and Apellant David S. Schachter.
Skadden, Arps, Slate, Meagher & Flom and Raoul D. Kennedy, Joren S. Bass, Joan Shreffler, San Francisco, Douglas B. Adler, Los Angeles, and Seth M. Schwartz, for Defendants and Respondents Citigroup, Inc. and Saloman Smith Barney, Inc.
*777 PERLUSS, P.J.
A financial brokerage company offers qualifying employees an incentive compensation plan that allows participants the option of using a portion of their annual earnings to purchase shares in the company's stock at a price below the stock's publicly-traded market price. If the participating employee resigns or is terminated for cause within a two-year vesting period, the employee forfeits the stock as well as the money used to purchase it.
Do the forfeiture provisions of this voluntary incentive compensation plan violate Labor Code sections 201 and 202,[1] which require an employer to pay its employee all earned but unpaid compensation following the employee's discharge or his or her voluntary termination of employment? As a matter of economic reality, employees who elect to participate in the plan's stock-purchase program are paid all the wages they designate to invest in company stock. Thus, the plan's forfeiture provisions do not violate the Labor Code; and the trial court in this case properly granted summary judgment in favor of the brokerage company.

FACTUAL AND PROCEDURAL BACKGROUND

1. The Incentive Compensation Plan

David B. Schachter is a former securities salesperson for Salomon Smith Barney (Smith Barney), a subsidiary of Citigroup, Inc. On December 21, 1994, while employed *779 by Smith Barney, Schachter elected to participate in Smith Barney's voluntary Capital Accumulation Plan (the Plan),[2] an incentive compensation plan intended, in part, to encourage retention of high-level employees.[3] Under the terms of the Plan, Schachter directed Smith Barney to pay him 5 percent of his total compensation "in the form of restricted stock out of all cash compensation paid to me" during the specified periods.[4] An employee's restricted Citigroup shares acquired under the Plan were purchased at a 25 percent discount below the stock's then-current market price.[5] Under the restrictions provided in the Plan, the stock could not be sold, transferred, pledged or assigned during a two-year period, which commenced on the date the stock was initially acquired. However, the participating employee retained the right during the two-year period to receive any regular dividends on the shares of restricted stock, as well as the right to direct the vote of his or her shares. If the participating employee remained employed for two years from the time the shares issued, title to the shares fully vested with the employee free of all restrictions.[6] If, on the other hand, the employee voluntarily terminated his or her employment or was terminated for cause during the two-year period, he or she forfeited the shares, as well as the money used to purchase them.[7]
Schachter received 44 shares of restricted stock on July 1, 1995 and 38 additional shares on January 2, 1996 in accordance with the Plan's terms. On March 31, 1996 Schachter voluntarily terminated his employment, forfeiting the 82 shares of restricted stock and the money used to purchase those shares.

2. The Lawsuit

In May 1998 Schachter filed his initial, putative class action on behalf of himself "and all others similarly situated" alleging, among other things, the Plan's forfeiture *780 provisions violated sections 201 and 202 and their enforcement amounted to conversion of his earned wages. In October 1998 Citigroup and Smith Barney (collectively, the Citigroup defendants) filed their first motion for summary judgment or in the alternative summary adjudication. On October 20, 2000 the trial court (Hon. Aurelio Munoz) denied the motion in its entirety. The court concluded, although Schachter had earned and had effectively been paid compensation in the form of restricted stock, his ultimate forfeiture of that stock as well as the funds used to purchase it when he left Smith Barney's employ within the two-year period constituted, a forced employee rebate in violation of the Labor Code.

3. The Second Summary Judgment Motion

On August 21, 2001 the trial court certified a plaintiff class of "former employees employed by defendants in California who participated in the same financial consultant program as [Schachter] and who have suffered financial damages as a result of the forfeiture provisions of the plan." On November 8, 2002 the Citigroup defendants filed a second motion for summary judgment directed to the operative third amended complaint,[8] making many of the same arguments advanced in their first summary judgment motion. While the Citigroup defendants' second summary judgment motion was pending, the case was reassigned to a different trial judge (Hon. Victoria Chaney). This time, after considering the briefing and holding a hearing on the matter, the court granted the motion and entered judgment in favor of the Citigroup defendants.

4. The First Appeal

Schachter appealed from the judgment entered following the court's order granting summary judgment, arguing the court had erred both procedurally in considering the second summary judgment motion and substantively in granting the motion on its merits. On February 8, 2005 we reversed the judgment, concluding the Citigroup defendants' filing of the second summary judgment motion violated Code of Civil Procedure section 437c, subdivision (f)(2), which prohibits a party from filing a summary judgment motion based on issues asserted in a prior summary judgment motion absent a showing of newly discovered facts or circumstances or a pertinent change of law. (Schachter v. Citigroup, Inc. (2005) 126 Cal.App.4th 726, 737-738, 23 Cal.Rptr.3d 920 (Schachter I).) In reversing the trial court's order and judgment, however, we observed that Code of Civil Procedure section 437c, subdivision (f)(2), did not, and could not, vitiate the court's inherent power under the California Constitution to reconsider its own rulings sua sponte. (Schachter, at p. 738, 23 Cal.Rptr.3d 920; accord, he Francois v. Goel (2005) 35 Cal.4th 1094, 1099, 29 Cal. Rptr.3d 249, 112 P.3d 636 [although Code Civ. Proc., § 437c, subd. (f)(2), prohibits court from granting renewed summary judgment motion that did not meet requirements *781 of statute, nothing prohibits court from reconsidering its previous ruling sua sponte].) In reversing the judgment on procedural grounds, we expressly did not reach the merits of the Citigroup defendants' motion. (See Schachter I, at p. 739, fn. 6, 23 Cal.Rptr.3d 920["[b]ecause we determined defendant's renewed summary judgment motion was not appropriate in light of [Code Civ. Proc] section 437c, [subd.] (f)(2), we need not reach the merits of the motion"].)

5. The Trial Court's Sua Sponte Reconsideration of Its Prior Order Denying Summary Judgment

Following our reversal of the judgment and remand for further proceedings, the trial court, upon the Citicorp defendants' request, elected to exercise its inherent authority to reconsider its original denial of the motion in accordance with Le Francois v. Goel, supra, 35 Cal.4th 1094, 29 Cal.Rptr.3d 249, 112 P.3d 636 and Schachter I, supra, 126 Cal.App.4th 726, 23 Cal. Rptr.3d 920. After the submission of supplemental briefing and a hearing, the trial court granted summary judgment in favor of the Citigroup defendants, concluding the Plan did not authorize an unlawful forfeiture of earned wages in violation of the Labor Code.[9]

DISCUSSION

1. Standard of Review

We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (Intel Corp. v. Hamidi (2003) 30 Cal.4th 1342, 1348, 1 Cal.Rptr.3d 32, 71 P.3d 296.) In reviewing the evidence we strictly construe the moving party's evidence and liberally construe the opposing party's and accept as undisputed only those portions of the moving party's evidence that are uncontradicted: "Only when the inferences are indisputable may the court decide the issues as a matter of law. If the evidence is in conflict, the factual issues must be resolved by trial. `Any doubts about the propriety of summary judgment ... are generally resolved against granting the motion, because that allows the future development of the case and avoids errors.'" (Binder v. Aetna Life Ins. Co. (1999) 75 Cal. App.4th 832, 839, 89 Cal.Rptr.2d 540.)

2. Governing Law

Under the Labor Code, when "an employer discharges an employee, the wages earned and unpaid at the time of discharge *782 are due and payable immediately." (§ 201, subd. (a).) When the employee quits his or her employment, "his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice ... in which case the employee is entitled to his or her wages at the time of quitting." (§ 202, subd.(a).)
The term "wages," as used in the Labor Code, "includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (§ 200; see also Prachasaisoradej v. Ralphs Grocery Co., Inc. (2007) 42 Cal.4th 217, 228, 64 Cal.Rptr.3d 407, 165 P.3d 133 (Prachasaisoradej) ["wages" or "earnings" as defined under the Labor Code are "the amount the employer has offered or promised to pay, or has paid pursuant to such an offer or promise, as compensation for that employee's labor"] (italics omitted).) This definition encompasses many forms of earnings, including those derived from profit sharing plans and other forms of incentive compensation plans (Prachasaisoradej, at p. 228, 64 Cal. Rptr.3d 407, 165 P.3d 133), vacation pay (Suastez v. Plastic Dress-Up Co. (1982) 31 Cal.3d 774, 779, 183 Cal.Rptr. 846, 647 P.2d 122) and other employee benefits to which the employee is entitled as part of his or her compensation (see Wise v. Southern Pac. Co. (1970) 1 Cal.3d 600, 607, 83 Cal.Rptr. 202, 463 P.2d 426 ["the term `wages' should be deemed to include not only the periodic monetary earnings of the employee but also the other benefits to which he [or she] is entitled as part of his [or her] compensation"]).
The Labor Code provisions requiring prompt payment of earned but unpaid wages at the time of the employee's resignation or termination reflect a legislative recognition that "`wages are not ordinary debts.'" (Kerr's Catering Service v. Department of Industrial Relations (1962) 57 Cal.2d 319, 326, 19 Cal.Rptr. 492, 369 P.2d 20.) "`[B]ecause of the economic position of the average worker and, in particular, his [or her] dependence on wages for the necessities of life for himself [or herself] and his [or her] family, it is essential to the public welfare that he [or she] receive his [or her] pay when it is due.'" (Ibid.; see also Phillips v. Gemini Moving Specialists (1998) 63 Cal.App.4th 563, 574, 74 Cal. Rptr.2d 29 ["there is in this state a fundamental and substantial public policy protecting an employee's wages"].) For this reason, the Labor Code provisions mandating prompt payment of wages following an employee's involuntary termination or resignation cannot be contravened or otherwise set aside by private agreement. (§ 219, subd. (a) ["no provision of this article can in any way be contravened or set aside by private agreement, whether written, oral, or implied"].)

3. Enforcement of the Plan's Forfeiture Provisions Does Not Violate Sections 201 or 202

a. Schachter and the other class members were paid the wages designated to purchase Citigroup stock

Schachter describes the vesting provisions of the Plan as requiring employees who leave Smith Barney prior to the completion of the two-year vesting period to forfeit not only the shares of the restricted Citigroup stock they had purchased, but also the "earned but unpaid compensation" used to purchase those shares. Schachter argues the forfeiture of earned but unpaid wages violates sections *783 201 and 202.[10] Although he voluntarily participated in the Plan, Schachter insists his consent is immaterial because, under section 219, subdivision (a), employees cannot waive or consent to a violation of the Labor Code's prohibition against forfeiture of earned wages.
Schachter's argument is grounded on the erroneous premise he was not in fact paid the money used to purchase the restricted Citigroup shares. That is, Schachter necessarily contends the funds he authorized be used to purchase the restricted stock were deferred, presumably to provide an income tax benefit for the participating employee, and then withheld from him entirely when he did not remain with Smith Barney for the required two-year vesting period. Although Schachter concedes he must relinquish the stock, he insists he earned and is entitled to the money used to purchase it; and the Plan's provisions requiring forfeiture of those funds unlawfully deprive him of his right to his earned wages in violation of sections 201 and 202.
Schachter's characterization of the Plan's provisions ignores both the substance and the economic reality of the transaction he authorized. According to the terms of his election form, Schachter expressly directed Smith Barney to purchase for him restricted stock from the "cash compensation paid to" him. Under the compensation package offered Schachter, he had a choice: He could be paid and actually receive his wages entirely in cash or he could use a portion of his cash compensation to participate in an investment program that allowed him to purchase at a substantial discount shares of restricted stock. By selecting the second option Schachter was afforded the thenpresent opportunity to vote his shares and receive dividends and owned a conditional future interest in shares of Citigroup stock that, once vested, had the potential for providing a return far greater than the funds used to purchase it. The transaction could easily have taken place in discrete steps. That is, Citigroup could have simply paid Schachter the money directly and permitted him to use a portion of his paid compensation to purchase the restricted stock. That transaction, as Schachter concedes, would not run afoul of the Labor Code prohibitions against forfeiture. The only difference between this hypothetical two-step transaction and the contemporaneous payment-and-purchase investment program actually used is that Schachter and the other participating employees received a substantial tax benefit as a result of the deferral of reportable income. It is difficult to conceive how this distinctiona tax benefit to the employeetransforms the nature of the transaction from one that is permissible under the Labor Code to one involving the unlawful forfeiture of "earned but unpaid" compensation.
At most, the omission of the intermediate step of delivering the money to Schachter before implementing his request to use it to purchase the designated restricted stock amounts to a deduction of wages for an authorized use, a transaction expressly permitted by section 224.[11] Although *784 an employer may not deduct, require repayment of wages earned or effect secret deductions that make it "appear as if an employer is paying wages in accordance with an applicable contract or statute when in fact [the employer] is paying less" (Steinhebel v. Los Angeles Times Communications LLC (2005) 126 Cal. App.4th 696, 707, 24 Cal.Rptr.3d 351; see also §§ 221, 222, 223), the employer may "withhold or divert any portion of an employee's wages" for the benefit of the employee when the deduction is expressly requested and authorized by the employee in writing, provided the deduction does not amount to a rebate or a deduction from the standard wage arrived at by collective bargaining or pursuant to a wage agreement. (§ 224; see also Steinhebel, at p. 707, 24 Cal.Rptr.3d 351; Finnegan v. Schrader (2001) 91 Cal.App.4th 572, 584, 110 Cal. Rptr.2d 552.)
Thus, if Schachter was not paid directly the money used to purchase the restricted stock, those funds were deducted for that purpose pursuant to Schachter's request and at his explicit authorization. That deduction is lawful under section 224. (See generally 3 Ops.Cal.Atty.Gen. 178, 179 (1944) [deductions permitted by law to be made from wages pursuant to the employee's written request include insurance premiums, hospital and medical dues and other items that are for the benefit of the employee, not the employer].) There is no argument or evidence the deduction itself was in contravention of any wage agreement. To the contrary, the deduction was made directly pursuant to the agreement.
Schachter does not dispute that a deduction to effect his stock purchase request is lawful under section 224 but insists it is beside the point. Notwithstanding the validity of the deduction itself, Schachter asserts he was entitled to have the money he designated for the purchase of the restricted stock returned to him pursuant to sections 201 and 202 when he voluntarily terminated his employment relationship. This position, like the other variations of Schachter's argument, necessarily assumes he received no present benefit from the use of this money deducted at his request. But, as we explained above, Schachter received the full benefit of his bargain. As part of his negotiated compensation package, Schachter requested and received, in addition to his cash compensation, both a present and conditional interest in the form of shares of restricted stock. Realization of any additional benefit (including avoiding a loss on his investment purchase) was part of the risk, not a guarantee, of his chosen compensation bargain.

b. Even if Schachter was paid in part in shares of restricted stock, rather than cash, the Plan's forfeiture provisions are lawful

Relying on language in the Plan that states "[a]wards [of restricted stock] will be made in lieu of cash payment of a percentage of the Participant's annual compensation," Schachter insists he was not paid the cash designated for the purchase of the shares. In support of this argument, Schacher characterizes the allegation in the Citigroup defendants' cross-complaint that an employee Plan participant *785 "agrees to reduce his or her commission compensation by a fixed percentage selected by the [employee] in exchange for an award of restricted shares of Citigroup stock" as a judicial admission that Smith Barney did not pay its employees the funds used to purchase the stock. (See Valerio v. Andrew Youngquist Construction (2002) 103 Cal.App.4th 1264, 1271, 127 Cal.Rptr.2d 436 [admission of fact in a pleading is a "judicial admission"; "[i]t is a waiver of proof of a fact by conceding its truth, and it has the effect of removing the matter from the issues"].)
The interpretation of the Plan, like any other contract, is a question of law unless extrinsic evidence introduced to resolve an ambiguity is in conflict. (Winet v. Price (1992) 4 Cal.App.4th 1159, 1165, 6. Cal.Rptr.2d 554; see Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839 ["interpretation of a written instrument, even though it involves what might properly be called questions of fact ... is essentially a judicial function to be exercised according to the generally accepted canons of interpretation"].) Neither a legal conclusion nor even a "mixed factual-legal conclusion" in a pleading constitutes a binding judicial admission. (Castillo v. Barrera (2007) 146 Cal.App.4th 1317, 1324, 53 Cal.Rptr.3d 494; see Bahan v. Kurland (1979) 98 Cal. App.3d 808, 812, 159 Cal.Rptr. 661 [when underlying facts belie pleaded conclusion, "the mistaken conclusion on the part of a pleader should not preclude a trial of the issues on its merits"].) As discussed in the preceding section, based on our construction of the language in the election form signed by Schachter, he and other class members were paid the wages designated for use to acquire the restricted stock: That is, Schachter authorized Smith Barney to use his cash wages to purchase the stock. Nonetheless, the distinction between the two interpretations is immaterial to Schachter's claim his wages were deferred. Even if Schachter did not receive cash, either directly or indirectly, and instead was "paid a portion of his compensation in the form of shares of restricted stock," his wages were not deferred and then withheld. He received them.
Citing sections 200 and 212 Schachter insists he was not paid his wages when he acquired the shares of restricted stock because the shares, which could not be sold or transferred prior to the expiration of the vesting period, were purportedly without an "ascertainable value" and thus do not satisfy the Labor Code's definition of wages. (See § 200, subd. (a) ["`[w]ages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation"].) However, section 200 states only that wages include all amounts paid: It does not prescribe how the value is to be determined or otherwise prohibit employees from negotiating a compensation package that includes as part of their wages a conditional future interest in a valuable asset.
More fundamentally, Schachter is simply incorrect when he asserts he received nothing of value when he acquired the shares of restricted stock. As we have explained, Schachter received as part of his negotiated compensation bargain both cash and an unconventional financial product (shares of restricted stock) that conferred the present right to receive dividends (and vote the shares) and a contingent future interest in freely marketable shares with a significant potential for a return greater than the cost of the stock. That financial product, like any other asset, had a real value, measured in part by *786 the cost, the potential return and the risk associated with the investment. (See Rosettenstein, The ALI Proposals and the Distribution of Stock Options and Restricted Stock on Divorce: The Risks of Theory Meet the Theory of Risk (2002) 8 Wm. & Mary J. Women & L. 243, 276 [issuance of restricted stock at substantial discount to employee subject to vesting condition that requires employee remain with company for a designated period of time confers a present and future benefit to employee with associated risks: "[O]nce the qualifying conditions are satisfied the employee receives a benefit even if the stock price has not climbed. [T]he associated negative risks are those of not meeting the qualifying conditions for the stock to vest or the risk of a market downturn. On the plus side, there is the possibility of an appreciation in value"].)
Schachter's reliance on section 212 is also misplaced. It provides only that, if a person is to be paid with "[a]ny order, check, draft, note, memorandum, or other acknowledgment of indebtedness," the instrument must be "negotiable and payable in cash, on demand, without discount." Even if Smith Barney paid Schachter shares of restricted stock in lieu of cash compensation (rather than using Schachter's cash compensation, when paid, to acquire the shares), those shares were not given as instruments of indebtedness of compensation; to the contrary, they were the compensation. (See Wise v. Southern Pac. Co., supra, 1 Cal.3d at p. 607, 83 Cal.Rptr. 202, 463 P.2d 426 ["the term "wages' should be deemed to include not only the periodic monetary earnings of the employee but also the other benefits to which he [or she] is entitled as part of his [or her] compensation"].)
Finally, even accepting Schachter's contention the shares of restricted stock were not wages because they had no ascertainable value, Schachter's claim still fails: If the shares of restricted stock were not wages, their forfeiture could not violate section 201 or 202. (See, e.g, International Business Machines Corp. v. Bajorek (9th Cir.1999) 191 F.3d 1033, 1039-1040 [because the amount of money for which shares can be sold on the market varies unpredictably from time to time, stock options are not wages under California law; as such, the employee's forfeiture of stock options upon the employee's termination does not violate §§ 201 or 202].)

c. Under Schachter's view of the Plan, Schachter did not earn either the money or the shares of restricted stock

Even if we were to accept Schachter's contention he was never paid his wages, either in cash or in the form of shares of restricted stock, his claim of unlawful forfeiture of earned wages would still fail as a matter of law because he could not show the funds used to purchase the shares were actually earned. Under basic incentive compensation plans the point at which the wage is actually earned is determined by the parties' agreement. (See Prachasaisoradej, supra, 42 Cal.4th at p. 229, 64 Cal.Rptr.3d 407, 165 P.3d 133["[e]mployees' expectations" with respect to incentive compensation "derive[ ] exclusively from the terms of the Plan itself']; Neisendorf v. Levi Strauss & Co. (2006) 143 Cal.App.4th 509, 523, 49 Cal. Rptr.3d 216 (Neisendorf) [plaintiffs "eligibility for bonus payments is properly determined by the bonus plans' specific terms and general contract principles"].) Typically, the employer offers a "stated benefit[ ] in exchange for the service of an employee, and upon the employee's completion of the required services in accordance with the terms of the plan, a binding *787 contract is formed under which the employer is obligated to deliver the promised benefits." (Neisendorf, at p. 523, 49 Cal. Rptr.3d 216 (italics omitted).) Such a benefit may be contingent on future events, including the employee's continued employment as of a specific target date, without running afoul of the Labor Code's prohibitions against the forfeiture of wages. (See Prachasaisoradej, at p. 239, 64 Cal.Rptr.3d 407, 165 P.3d 133 ["where the parties so understand and agree, final compensation, or at least a portion thereof, may be contingent on events that occur after the employee has performed a service"]; see also Murphy, Politics, Economics, and Executive Compensation (1995) 63 U. Cin. L.Rev. 713, 722 [observing in the universe of executive incentive compensation, "annual and long-term bonus plans based on accounting profits ... [have been] supplanted by increased grants of stock options and restricted stock"].)
Neisendorf, supra, 143 Cal.App.4th 509, 49 Cal.Rptr.3d 216 is illustrative. The employer, Levi Strauss & Company, provided an annual incentive plan (AIP) for employees that was contingent on whether annual individual and company targets were satisfied. The AIP terms provided, "`Unless termination is due to retirement, layoff, long-term disability or death, a participant must be an active employee of the company on the payment date in order to receive an AIP payment. AIP payments are generally made in February following the close of the fiscal year.... `If an employee is involuntarily discharged (e.g., poor performance or misconduct) prior to the AIP payment date, that employee will have no right to AIP.'" (Id. at p. 521, 49 Cal. Rptr.3d 216.)
After the plaintiff in Neisendorf was involuntarily discharged for poor performance or misconduct prior to the close of the fiscal year, she sued Levi Strauss claiming, among other things, the AIP's forfeiture provisions violated sections 201 and 202. The Court of Appeal rejected that argument: "We find nothing in the public policy of this state concerning wages that transforms Neisendorf's contingent expectation of receiving bonuses into an entitlement. The cited statutes governing wages, and prohibiting an employer's unilateral act to cause a forfeiture of wages, are manifestly applicable when wages have been promised as part of the compensation for employment and all conditions agreed to in advance for earning those wages have been satisfied.... [¶] In this case, there was no promise made to Neisendorf that she would earn the AIP.... [Levi Strauss] expressly tied the payment of an AIP bonus ... to a measurable benchmark. The language of [the AIP] required that she not be terminated for cause before the payout date." (Neisendorf, supra, 143 Cal.App.4th at pp. 522-523, 49 Cal.Rptr.3d 216.) Because Neisendorf "was terminated for cause before the bonus payout date, [Levi Strauss] was not obligated to pay her a bonus under the AIP plan" for the 2002 fiscal year. (Id. at p. 524, 49 Cal.Rptr.3d 216.)
Assuming the funds used to purchase the shares of restricted stock were not paid to Schachter, then, like the plaintiff in Neisendorf, Schachter necessarily agreed his compensation would consist of cash payments and a retention-based conditional interest in the shares, with the latter being earned only if he remained with Smith Barney for two years. He elected not to remain for the designated period (presumably after making a calculated decision that the economic and noneconomic reasons to leave outweighed the reasons to stay, which included completing the required service needed to earn the restricted stock). Accordingly, Schachter did not earnand thus had no right to receive either the restricted stock or the funds used to purchase it. (Neisendorf, supra, *788 143 Cal.App.4th at pp. 523-524, 49 Cal. Rptr.3d 216; Lucian v. All States Trucking Co. (1981) 116 Cal.App.3d 972, 975, 171 Cal.Rptr. 262 [the bonus plan "had been consistently applied to preclude the vesting of any benefits unless the participant completed the current calendar year in the service of his employer. [Citation.] [A]n employee who voluntarily leaves his employment before the bonus calculation date is not entitled to receive it"]; Koehl v. Verio, Inc. (2006) 142 Cal.App.4th 1313-1337, 48 Cal.Rptr.3d 749 [employer may charge back sums advanced on sales commissions that, under the employment agreement, were not deemed earned until all conditions precedent had been satisfied].) [12]

4. The Plan Does Not Violate Section 219

Finally, Schachter's reliance on section 219 as a basis to invalidate the Plan's forfeiture provisions is misplaced. Section 219 prohibits employers from attempting to accomplish by agreement with the employee a forfeiture of wages that would otherwise be prohibited under the Labor Code. Here, there was simply no unlawful forfeiture of earned wages in violation of the Labor Code: Either Schachter was paid all his compensation, either directly or indirectly through a deduction that Schachter requested and expressly authorized, or he did not earn the shares or the money used to purchase them because he left Smith Barney before the two-year retention period was satisfied. Accordingly, the trial court did not err in granting summary judgment in favor of the Citigroup defendants.[13]

DISPOSITION
The judgment is affirmed. The Citigroup defendants are to recover their costs on appeal.
We concur: WOODS and ZELON, JJ.
NOTES
[1] Statutory references are to the Labor Code unless otherwise indicated.
[2] When initially established, the Plan was sponsored by Travelers Group, Inc., the publicly-traded parent company of Smith Barney. Travelers Group subsequently merged with Citicorp to create Citigroup, Inc.
[3] As expressed in the Plan documents, "The purpose of the Plan is to enable [Citigroup] and its Subsidiaries to attract, retain and motivate officers and other key employees, to compensate them for their contributions to the growth and profits of the Company and to encourage ownership of stock in the Company on the part of such personnel."
[4] Under the Plan's terms the participating employee had a choice of selecting 5, 10, 15, 20 or 25 percent of his or her cash compensation to be used to purchase the shares of restricted stock.
[5] The election form Schachter signed on December 21, 1994 stated, "I elect to participate in the Capital Accumulation Plan (CAP) subject to all of the provisions and administrative rules of the Plan. I hereby Irrevocably direct my employer, Smith Barney, to pay me the percent indicated below in the form of restricted stock out of all cash compensation paid to me during the period indicated below. I understand if I leave Smith Barney voluntarily or if I am terminated with Cause before the restrictions lapse on shares of restricted stock received under the Plan, I will forfeit the stock as well as the money I am authorizing to be paid in the form of such restricted stock." Schachter checked the box on the form indicating the portion of his total compensation he wished to be paid to him in restricted company stock was 5 percent.
[6] Schachter and Citigroup agree the participating employees' restricted shares were not included in the participants' gross income for federal tax purposes until the two-year vesting period had expired, pursuant to section 83 of the United States Internal Revenue Code (26 U.S.C. § 83).
[7] Employees who were involuntarily terminated without cause or who retired from employment were not subject to the same forfeiture provisions.
[8] On February 27, 2002 Schachter filed a third amended complaint (the original complaint had been amended once on December 9, 1999 and again on February 16, 2001) containing the same causes of action for section 201 and 202 violations and conversion.

On March 29, 2002 Citigroup filed a cross-complaint asserting that, if the Plan is found to be unlawful, it should be rescinded and the plaintiff members of the class should be compelled to return or otherwise relinquish the benefits received as a result of their participation in the Plan, "including any and all vested shares ... plus any dividend or dividend equivalent payment made pursuant to the Plan." Schachter's subsequent summary judgment motion directed to the cross-complaint was denied.
[9] As was true with the prior judgment, the judgment now on appeal does not address the Citigroup defendants' cross-complaint, thereby potentially creating an obstacle to our jurisdiction. (See Holt v. Booth (1991) 1 Cal. App.4th 1074, 1081, 2 Cal.Rptr.2d 727 ["`[j]udgment rendered on a complaint alone, unaccompanied by judgment on a pending cross-complaint, is not a final judgment and appeal from it may be dismissed'"].) However, when, as here, the summary judgment order effectively disposes of the issues raised in the cross-complaint, the appellate court can amend the judgment to dispose of the entire action and thereby properly exercise appellate jurisdiction in the matter. (Swain v. California Casualty Ins. Co. (2002) 99 Cal. App.4th 1, 6, 120 Cal.Rptr.2d 808 [[appellate] court may, in its discretion, where the intention of the trial court was clear, order judgment rather than send the case back for the performance of that act"'"]; Holt, at p. 1081, 2 Cal.Rptr.2d 727 [same].) Accordingly, because the trial court effectively disposed of the cross-complaint by declaring the Plan did not violate sections 201 and 202 as a matter of law, we amend the order granting summary judgment and the judgment nunc pro tunc to deny relief on the Citigroup defendants' cross-complaint (see Swain, at p. 6, 120 Cal.Rptr.2d 808). We thereby accomplish explicitly what this court previously effected implicitly in the appeal from the original judgment.
[10] The plaintiff class relies on both sections 201 and 202 because, as defined, the class includes former employees who voluntarily quit their employment and those who were terminated for cause.
[11] Section 224 provides in part, "The provisions of Sections 221 [prohibiting employer from collecting or receiving from employee any part of wages theretofore paid by employer to employee], 222 [prohibiting employer from willfully withholding any part of agreed upon wage from employee] and 223 [prohibiting employer from secretly paying a lower wage while purporting to pay wage designated by statute or contract] shall in no way make it unlawful for an employer to withhold or divert any portion of-an employee's wages when the employer is required or empowered to do so by state or federal law or when a deduction is expressly authorized in writing by the employee to cover insurance premiums, hospital or medical dues, or other deductions not amounting to a rebate or deduction from the standard wage arrived at by collective bargaining or pursuant to wage agreement or statute, or when a deduction to cover health and welfare or pension plan contributions is expressly authorized by a collective bargaining or wage agreement."
[12] The Plan's forfeiture provisions applied only to those employees who voluntarily terminated their employment or were, terminated for engaging in some volitional misconduct that subjected them to termination. Like the court in Neisendorf, "[w]e express no opinion on whether the result would be [the] same in this case" if the provisions applied to those who were involuntarily terminated without cause or to those who were wrongfully discharged. (Neisendorf, supra, 143 Cal.App.4th at p. 524, fn. 10, 49 Cal.Rptr.3d 216.) "We merely note, `[t]he law does not support a forfeiture in ... circumstances where the employees were terminated through no fault of their own after having substantially performed the services entitling them to a bonus.'" (Ibid.)
[13] Schachter's conversion claim alleged the enforcement of the Plan's forfeiture provisions "in violation of Labor Code §§ 201 and 202 constitutes conversion of property" rightfully belonging to him and the other class members. Because the enforcement of the forfeiture provisions did not violate the Labor Code, Schachter's conversion claim fails as a matter of law. (See Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 451, 61 Cal. Rptr.2d 707 [to establish conversion, plaintiff must demonstrate a right to possession of the property he or she alleges was converted].)