Filed 2/24/15  In re Sara G. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re SARA G., a Person Coming Under the Juvenile Court Law. | B258590<br>(Los Angeles County<br>Super. Ct. No. CK88942) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>CHRISTINA A.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Christina A. (mother) is the mother of Sara G., who is the subject of this dependency proceeding. Mother appeals from an order terminating her parental rights, arguing that the juvenile court erred in failing to apply the beneficial parental relationship exception to termination of parental rights (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1] For reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Sara (born in August 2006) and her family first came to the attention of respondent Department of Children and Family Services (DCFS) in September 2008, because of a referral alleging that mother had emotionally abused the two-year-old and her 12-year-old sibling, Joseph. The referral also alleged that mother had been involuntarily hospitalized in a psychiatric facility, and the children left in the care of their maternal grandmother (grandmother) and stepgrandfather. The stepgrandfather was a registered sex offender who had molested mother as a child. Mother subsequently agreed to participate in a reunification plan. The children were placed with a maternal aunt Martha A. (Martha).[2] Mother successfully completed her reunification plan in December 2009, and the children were returned to her care.

In mid-May 2011, DCFS stepped in again after Joseph told school personnel that mother had kicked him as he slept on the floor, punched him in the eye with her fist and had several times kicked him out late at night, forcing him to walk to his grandparents' house. Joseph told DCFS that Sara stayed with Martha most of the time. An investigation revealed that mother had a significant criminal history of drug-related crimes, battery and other charges. Martha told DCFS that mother frequently exhibited irrational behavior, such as screaming at and threatening Joseph and kicking him out of the house. Martha said Sara had witnessed mother's frequent rages and that it took the child several days afterward to recover.

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Sara's father Donato G. (who is not a party to this appeal) was in prison. Joseph's alleged father Robert Perez could not be located.

Mother acknowledged that she was not then capable of caring for her children, and agreed to a safety plan leaving them in Martha's care.[3]

The children were detained in mid-July 2011, after DCFS filed a section 300 petition. That petition, as ultimately sustained, alleged the children risked being harmed due to mother's inappropriate discipline of Joseph, periodic bouts of depression, and anger management problems, all of which rendered her unable safely to care for the children. Mother was given monitored visitation.

On October 6, 2011, mother pleaded no contest to the petition. A combined jurisdictional and dispositional hearing was conducted the following day. In advance of that hearing DCFS reported that mother denied having hit Joseph, but acknowledged her history of drug-related crimes and said she began using PCP at age 13. She attributed her history of mental and emotional problems to having been sexually abused as a child by stepgrandfather.

Joseph told DCFS that mother was sad, depressed and slept a lot, and became worse when she stopped taking her medication for anger. Sara denied being hit by mother or having seen her hit Joseph. It was reported that Sara was a happy child with a bright affect who enjoyed living with Martha, with whom she had lived periodically since age two. Sara was confused as to whether she wanted to stay with Martha or live with mother. Mother acknowledged that she and the children needed counseling, and wanted to learn how better to communicate and not to yell when she was upset. At the conclusion of the hearing the children were declared dependents and removed from mother's custody. Mother was given reunification services, and ordered to participate in parenting and counseling programs.

By mid-May 2012, DCFS reported that mother had undergone therapy and showed some stabilization in her moods. Her coping skills had improved which, in turn, decreased her previously severe, aggressive, angry outbursts. Mother believed her medication was working. DCFS also reported that mother was mostly consistent in her visitation, and that she and Sara communicated well and appeared to share a strong bond. The social worker

---

[3] Joseph (who is not a subject of this appeal) was subsequently moved at Martha's request and placed in foster care, due to behavioral problems.

reported that Sara seemed to feel pulled two ways: she wanted to live with mother but was afraid to do so unless Joseph was there too, and also liked living with Martha and would be happy to stay there and be adopted if she was unable to return to mother. In light of mother's progress, the juvenile court continued reunification services and liberalized her visits with Sara to at least six hours per week, unmonitored.

The situation worsened a month later. In mid-June, police responded to a call that Joseph had jumped from a moving vehicle during a verbal altercation with mother. Sara was in the car at the time. She was frightened by mother's behavior with Joseph and afterwards, when mother cursed and threw things around their apartment. Sara told DCFS she wanted to continue her daytime visits with mother, but did not want overnight visits.

The police became involved again in September 2012, and mother was arrested for cruelty to a child after an incident that took place in front of Sara during which mother assaulted grandmother and held a sharp object to her neck. Sara told police she had locked herself in the bathroom after mother began yelling at grandmother and kicked her in the leg. The police told DCFS Sara was also upset when mother argued with the officers and was difficult to restrain. Sara still wanted to see mother, although she remained "kind of" afraid" of her.

Mother and grandmother each denied that mother actually struck grandmother. Both women, however, admitted that mother had been very angry and had aimed her fists and/or a kick in the air at grandmother. Mother had wanted grandmother to leave, but she refused to leave Sara alone with mother. Grandmother said she instructed Sara to lock herself in the bathroom after mother began throwing things around the house, including a children's table. Mother then held one of the table's broken legs against grandmother's throat while pinning her against a couch. Afterwards mother left Sara with the child's father, rather than returning her to Martha. The father in turn took Sara to grandmother's home where she was not supposed to be. Grandmother later returned the child to Martha. Grandmother told the police mother had physically assaulted her numerous times. She believed mother posed a danger to herself and to Sara. Shortly after this incident mother's visits reverted to supervised status.

4

The 18-month review hearing began in mid-January 2013, and was thereafter continued several times. Prior to and in connection with the hearing, DCFS reported that mother had missed or been late for several visits with Sara. Mother had admitted herself to a psychiatric facility in December 2012 for depression, and her friends worried she may have overdosed on her psychotropic medications in April.

In April and May 2013, DCFS reported that mother had not undergone drug testing, but did complete a parenting program. Mother's therapist told DCFS that mother's mood had stabilized after she began taking her psychotropic medicine in March, and she no longer engaged in angry outbursts against the treatment staff. Mother visited Sara on a fairly regular basis, and believed she was prepared to care for her children. Sara enjoyed mother's visits, but told DCFS she did not feel ready to return home and wanted to stay with Martha. She wanted the visits to continue, but asked that they be monitored because she remained a "little scared" of mother. Mother and Sara had participated in two joint therapy sessions. Sara returned to Martha's home "very distraught" after the first session, saying that "no one loved her [or] would listen to her," and she had to return to mother because no one would adopt her. DCFS remained concerned that mother's condition and ability to cope with daily life had not sufficiently improved. The agency recommended reunification services be terminated.

In mid-July 2013, DCFS reported that the director of the program at which mother received instruction in anger management, parenting and life skills, believed mother's mental health issues interfered with her ability to understand and implement new skills and information she received during treatment. Mother's therapists reported that mother felt her mood had improved since she began taking medication, and they had no obvious safety concerns. Meanwhile, Sara told DCFS she did not want to live with mother, but wanted to stay with Martha. She wanted mother's visits to continue, but was still somewhat afraid of her. Sara wanted supervised visits because mother had been "mean to [grandmother] and the police had come." At the conclusion of the 18-month review hearing on July 18, 2013, the juvenile court ordered reunification services to continue, and gave mother six hours of

unmonitored visitation per week. It also ordered that grandmother was not to attend those visits.

In September 2013, DCFS filed a section 388 petition requesting that mother's visits be returned to supervised status. Mother had not complied with the order that grandmother not be present during visits, and Sara had been taken to grandmother's house while the step-grandfather was present. In October, the court admonished mother again not to bring grandmother to visits. In November, after learning grandmother had come into the waiting room and talked to the children after a visit with mother, the court granted the petition and monitored visitation was reinstated.

When the selection and implementation (section 366.26) hearing began in April 2014, DCFS reported that Martha and her daughter Arlene were committed to adopting Sara and co-parenting together, had demonstrated an ability to meet the child's needs, and had an approved homestudy. Sara told DCFS she loved her aunt and cousin and wanted them to adopt her if she was unable to return to mother.[4] Mother's monitored visits continued. After one visit in March, Sara became very emotional, and told Martha "she just wanted a family and someone to love her." Although Sara wanted to stay with Martha, she was anxious and afraid to say so in court because mother would get angry.

Meanwhile, mother continued visiting Sara sporadically at DCFS's offices. In May 2014, mother filed a section 388 petition requesting that the court either reinstate reunification services or return Sara to her care. She argued that the modification was in Sara's best interest because she had raised the child for "a large majority" of her life, and they shared a strong bond. She also said she was participating in mental health treatment and had made progress. The petition was set for hearing.

In an updated assessment in July 2014, DCFS reported that Sara said she was "really, really happy" living with Martha. She expressed a desire to be adopted and "[couldn't] wait"

---

[4] Sara described adoption as "when you have a mommy but you live with someone else."

for it to happen. Sara had nightmares about testifying in court that she wanted to stay with Martha. Sara's caretakers told DCFS that the child acted out before and after visits with mother, and it took her days to recover. Sara told her caretakers "she wanted to belong to a family," but felt that "no one loves her and that she [was] afraid of losing [them]." When asked if she understood what it meant to be adopted, Sara said Martha would be her mother, and that she would be siblings with Arlene and Martha's son. Sara also said she enjoyed seeing mother and wanted the visits to continue.

DCFS reported that mother, then living in a motel, missed a scheduled visit with Sara in July, and arrived late for others in June.[5] Mother's counselor told DCFS mother had successfully completed therapy, and that her depression was situational and involved Sara's prospective adoption. DCFS expressed concern regarding mother's credibility and her ability to protect Sara from the stepgrandfather. In February 2014, mother told DCFS she lived with an aunt, but the stepgrandfather said mother lived at his house. Mother's therapist told DCFS mother was homeless. In July 2014, mother said she was living in a motel but planned to move into a property owned by a friend.

Mother's section 388 petition was argued and denied on July 15, 2014. Proceeding to the section 366.26 hearing, the court admitted into evidence various DCFS reports and a declaration from a social work investigator employed by mother's counsel. The investigator declared that she had observed a 90-minute visit between mother and Sara in June, and the two seemed to share a "rhythm" in their manner of speaking and demeanor.

Sara testified that she had lived with Martha for three years, and liked it "a lot." She also enjoyed mother's visits during which they played games. Her family had discussed adoption with her. To Sara, adoption meant "somebody else that you know and you truly want to live with them is going to take care of you." She had not been told that adoption meant mother would no longer be her mother. Sara said it "would be okay" if mother was

---

[5] DCFS reported that, although mother was supposed to see Sara weekly, she had just one visit in October 2103, one in January, February, March and July 2014, respectively, and twice in June. She arrived late for her last two visits.

not her mother, but that she "would be kind of sad." She would be really sad if she could no longer see mother and wanted to continue the visits, but "while in adoption." Martha told Sara the visits could continue. Sara testified that it was Martha who took her to school, or to the doctor and dentist. She told the judge she "really want[ed] to be adopted" by her "tia."

The section 366.26 hearing concluded on August 12, 2014. DCFS reported discussing mediation and the possibility of a postadoption agreement with Sara's caretakers, but neither wanted to further delay permanency for Sara. The caretakers did not believe mediation was necessary because they were amenable to Sara continuing to have supervised visits with mother. DCFS was working on a proposed visitation schedule with parameters to ensure Sara's physical and emotional safety. At the conclusion of the hearing, the court found that Sara was adoptable and that no exception to adoption applied, and terminated parental rights. Mother appeals.

## DISCUSSION

Mother maintains that the juvenile court erred by refusing to apply section 366.26, subdivision (c)(1)(B)(i), commonly known as the beneficial relationship exception to adoption, and should instead have ordered a legal guardianship. We conclude otherwise.

1. *Controlling law*

Section 366.26 governs the juvenile court's selection and implementation of a permanent placement plan for a dependent child. The purpose of the section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) To that end, at a section 366.26 hearing, after a juvenile court has determined a child cannot be returned to her parent's care the court must order one of three alternatives: adoption, guardianship or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.) Where possible, adoption is the preferred permanent plan, "'because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re C.B.* (2010) 190 Cal.App.4th 102, 122 (*C.B.*).) Accordingly, if the court finds that a child cannot be returned to parental care and is adoptable, it must select adoption as the permanent plan unless it finds that termination of parental rights would be detrimental to the child under

one of several statutory exceptions. (§ 366.26, subd. (c)(1)(B); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Only one exception is at issue here.[6] The beneficial relationship exception of section 366.26, subdivision (c)(1)(B)(i) permits the court to order a permanent plan other than adoption if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parent bears the burden to establish that "'termination of parental rights would be detrimental to the child under . . . the exception[].'" (*C.B.*, *supra*, 190 Cal.App.4th at p. 122.)

To determine the applicability of the beneficial relationship exception the juvenile court "'balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.' ([*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575].) 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' (*Ibid*.)" (*C.B.*, *supra*, 190 Cal.App.4th at p. 124.)

Application of the exception is examined case-by-case, taking into account variables which may affect a parent/child bond such as the child's age, how much of her life was spent in the parent's custody, the positive or negative effects of interactions between parent and child, and the child's unique needs. (*C.B.*, *supra*, 190 Cal.App.4th at p. 124.) A parent "may not derail an adoption merely by showing the child would derive *some* benefit from continuing the [parental] relationship." (*In re Angel B*. (2002) 97 Cal.App.4th 454, 466.) Children ordinarily derive an incidental benefit from interactions with a natural parent. (*In re Brandon C*. (1999) 71 Cal.App.4th 1530, 1534.) The

---

[6] At the section 366.26 hearing mother argued that the sibling relationship exception applied (§ 366.26, subd. (c)(1)(B)(v); she has not raised that argument on appeal.

exception applies only if the parent is able to show that continuing the relationship will promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, "[a parent] must show that [she] occup[ies] "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.) We review the juvenile court's factual findings as to whether the beneficial relationship exception applies for substantial evidence. (*Id.* at p. 622; *In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

If the court determines that a beneficial relationship exists, it must then balance the likely benefit the child will derive from maintaining a parental relationship against the benefits of adoption. This portion of the court's order is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the [parental] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315, italics omitted.) Accordingly, we review this component of the juvenile court's decision for abuse of discretion. (*Ibid.*; *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621–622.)

2.      *Mother failed to establish the beneficial relationship exception to termination of parental rights.*

Mother insists she presented sufficient evidence to establish the beneficial relationship exception. She argues that her visitation was consistent, that Sara enjoyed the visits and that, because she cared for Sara the first few years of her life, she and her daughter share a strong parent/child bond which necessitates application of the exception.

We assume for the purpose of discussion that mother maintained regular contact and visitation with Sara. A more fundamental problem here lies in the quality of the parent/child relationship, and Sara's need and strong desire for the safe, stable family life mother remains unable to provide. The beneficial relationship exception applies only if a parent occupies a parental role in her child's life. (*In re B.D.* (2008) 159 Cal.App.4th

10

1218, 1234.) To establish the exception "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) It is undisputed that Sara loves mother, enjoys their visits and wants them to continue. There is, however, insufficient evidence in the record to support a conclusion that mother occupied a substantial parental relationship with Sara to the extent that "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother clearly loves Sara and wants to be in a position to care for her. To that end, mother made a concerted (albeit belated) effort to address her severe anger management problems and other mental health issues that gave rise to this action. Mother's behavior during visits was appropriate, she expressed concern about insect bites Sara had sustained, discussed problems with her daughter's desire to cut her hair, and she and Sara enjoyed playing games. However, the record also reflects that Sara cried and acted out before and after mother's visits, and that it took days afterward for her to recover. Sara returned from one joint therapy session with mother saying, "no one loved her." She was afraid of losing Martha and Arlene. In addition, after witnessing mother's abuse of Joseph and grandmother, Sara was still "kind of afraid" of mother. She insisted that mother's visitation be monitored, and did not want any overnights.

There is no doubt Sara wants mother to continue to be a part of her life. The child testified that the fact mother would no longer be her "mother" if she were adopted made her "kind of sad." Nevertheless, Sara remains adamant that she "really wants to be adopted," and believes it "would be okay" to lose mother as a parent. She wants mother's visits to continue, but only "while in adoption."

Mother was not able to provide evidence that her relationship with Sara was significantly beneficial to the child to outweigh the benefits of adoption. Consistent loving contact by a parent and child is necessary but not sufficient to establish the continuing beneficial relationship exception. For example, in *In re Bailey J.*, *supra*, 189 Cal.App.4th at page 1316, the court found no error in the trial court's decision to

11

terminate parental rights despite a mother's positive, consistent visitation, during which she took responsibility to feed and change the child, who "looked to her for 'comfort' and in 'times of stress' during the visits." Notwithstanding the fact that there was a positive parent/child relationship, the juvenile court was not found to have abused its discretion by finding "the relationship between the mother and Bailey did not constitute a 'compelling reason' for finding that adoption would be detrimental to" the child, because the mother and child's "frequent and loving contact was insufficient to show the requisite beneficial parental relationship." (*Id*. at pp. 1316–1317; see *In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 229; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1351–1352 [upholding order terminating parental rights where "benefit of a stable, permanent adoptive home for [child] clearly outweighed the benefit of a continued [positive and special] relationship with" parent].)

By the time the section 366.26 hearing was conducted—three years after this action was initiated, and five years after mother's emotional abuse of her children first brought her family to DCFS's attention—mother remained restricted to weekly monitored daytime visits with her daughter. Although Sara shares a bond with mother, she is very clear that she wants to remain in Martha's care. In contrast with Martha, who has demonstrated her commitment to Sara and ability to meet the child's needs during her four (or more) years as the child's caretaker, mother never advanced beyond the role of a friendly visitor with whom Sara enjoys spending time. The record does not establish that the child would suffer significant harm if that relationship ceased, or that such harm would likely to outweigh the benefit of her secure, stable and permanent placement with her maternal aunt. (See, e.g., *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1316–1317; *In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 229.)

We reject mother's assertion that the juvenile court should have ordered guardianship rather than adoption because that plan would ensure a better chance of a continuing relationship with her daughter. Nothing in the record suggests that Martha was interested in the less permanent alternative of becoming Sara's legal guardian. She and Arlene are ready and committed to become adoptive parents, and to continue to

12

provide Sara a permanent and stable home.  Adoption is the Legislature's preferred permanent plan once the possibility of reunification is no longer viable.  The court struck the proper balance when it found that the benefit to Sara of maintaining her relationship with mother was outweighed by the benefits of a permanent adoptive home.  Its order terminating parental rights was not an abuse of discretion.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.