[No. A109826. First Dist., Div. Four. Aug. 29, 2006.]

BARBARA J. NEISENDORF, Plaintiff and Appellant, v.
LEVI STRAUSS & CO. et al., Defendants and Respondents.

COUNSEL

Schneider & Wallace, Todd M. Schneider, Carolyn H. Cottrell, Zachary R. Cincotta; The Lucas Law Firm, Kathleen M. Lucas; Law Office of Ted W. Pelletier and Ted W. Pelletier for Plaintiff and Appellant.

Littler Mendelson, Margaret Hart Edwards, Michael Mankes and Paul R. Lynd for Defendants and Respondents.

OPINION

RUVOLO, P. J.—

## I.

## INTRODUCTION

Following 14 weeks of medical leave, appellant Barbara J. Neisendorf's at-will employment with respondent Levi Strauss & Co. (LS&Co.) was terminated. She filed suit, claiming, among other things, that the termination of her employment violated the Moore-Brown-Roberti Family Rights Act of 1993 (CFRA) (Gov. Code, § 12945.2; Cal. Code Regs., tit. 2, § 7297, subd. (b)) and the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). After most of Neisendorf's case was dismissed on summary adjudication, including her claims of gender and age discrimination, her remaining claims for disability discrimination in violation of the FEHA and retaliation for taking a medical leave under the CFRA, proceeded to jury trial. At the conclusion of four weeks of trial, the jury returned a verdict in favor of LS&Co. finding, by special verdict, that Neisendorf was not terminated in retaliation for having taken medical leave under the CFRA and that she was not a "disabled person" entitled to FEHA's protection.

While Neisendorf does not challenge the jury's verdict entered in favor of LS&Co., she appeals two rulings made by the trial court. She first claims the court erred in dismissing her cause of action for violation of the CFRA after the court found that the undisputed facts established that LS&Co. fulfilled all of its affirmative obligations to Neisendorf in conjunction with her CFRA medical leave. She next claims the court erred in ruling that she was not entitled to certain bonus payments from LS&Co. because Neisendorf's

employment with LS&Co. was terminated before she became eligible for any of the bonus payouts. We affirm.

## II.

## FACTS AND PROCEDURAL HISTORY

On September 20, 2000, LS&Co. made a written offer of employment to Neisendorf. It offered Neisendorf the position of "Vice President, Worldwide Training and Development" at an annual salary of approximately $250,000, a signing bonus of $250,000, relocation expenses, participation in two incentive bonus plans, and a benefits plan. The written offer provided that the employment relationship was "at-will" and indicated that LS&Co. "reserve[d] the right to terminate your employment at any time with or without cause and with or without notice." Neisendorf accepted LS&Co.'s offer of employment on September 26, 2000.

During Neisendorf's two years with LS&Co., both her direct supervisor, Fred Paulenich (Paulenich), and her subordinates voiced concerns about her performance. In July 2002, Neisendorf received a written midyear review from Paulenich, which pinpointed several concerns. The midyear review noted Neisendorf's "effectiveness—and by extension personal credibility—is greatly hampered by the inability to plan and execute on time, on budget against a broadly understood and aligned agenda." Paulenich cited "nagging/reoccurring issues" with Neisendorf's "personal leadership approach," which was described as "self-serving, upward-serving; not supportive; mistrust; lack of sincerity/genuineness; controlling . . . ." He concluded with the observation that "[t]his is a critical leadership juncture" for Neisendorf.

Paulenich met with Neisendorf three different times during July and August 2002 to address the issues raised in this midyear review. Neisendorf refused to acknowledge the criticisms, blaming Paulenich and others. Paulenich told Neisendorf that she was not accepting his feedback and that she needed to reflect on what they discussed and begin developing a plan to address the performance issues. At the third meeting, Neisendorf declared that they were at an "impasse." She offered to resign and requested a separation package worth approximately $1.7 million.

On August 23, 2002, shortly after learning that LS&Co. had determined she was not eligible for a separation package, Neisendorf took a four-week disability leave based on her physician's note stating simply that, "Medically,

Ms. Neisendorf is unable to work." Neisendorf was ultimately diagnosed as suffering from neurodermatitis, irritable bowel, and muscle spasm. She later saw a psychiatrist who diagnosed her with a panic disorder. LS&Co. notified Neisendorf of her rights and obligations under the CFRA and the federal Family and Medical Leave Act of 1993 (FMLA).[1] On September 20, 2002, Neisendorf's physician extended her leave by four weeks.

About eight weeks into her leave, Neisendorf was medically cleared to return to work if she got needed accommodations. Neisendorf, along with her attorney and psychiatrist, provided LS&Co. with a list of required accommodations for Neisendorf's return to work. The proposed accommodations included: (1) hiring a neutral external job coach to "facilitate the re-establishment of a harmonious and peaceful working relationship" between Neisendorf and Paulenich; (2) a job redesign for one to three months during which Neisendorf could have a 40-hour workweek, time off to complete treatment, and would not be required to execute or witness employee terminations; and (3) a reporting relationship to someone other than Paulenich for a period of "three months or more."

LS&Co. responded that it did not believe Neisendorf was legally disabled; nevertheless, it was willing to work with her to help her return to work. For the next several weeks, LS&Co. and a return-to-work specialist worked with Neisendorf, her attorney, and her psychiatrist to identify appropriate accommodations acceptable to LS&Co. which would allow her to return to work successfully. However, Neisendorf was repeatedly informed that her successful return to her former position was conditioned on her willingness to accept and address the performance deficiencies set forth in the midyear performance review.

On November 25, 2002, the return-to-work specialist met with Paulenich and Neisendorf together. After discussing the agreed-upon accommodations, Paulenich went over the agenda for the one-on-one meeting with Neisendorf scheduled for the next day, including a reminder that they would be discussing performance issues and a development plan. The November 26th meeting lasted two hours during which Paulenich briefed Neisendorf on the status of her projects. Neisendorf and Paulenich agreed that Neisendorf would immedi-

---

[1] The CFRA and the FMLA (29 U.S.C. § 2601 et seq.), which is "[CRFA's] federal counterpart," provide similar protections to employees needing family or medical leave. (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261 [108 Cal.Rptr.2d 739] (*Dudley*); *Gibbs v. American Airlines, Inc.* (1999) 74 Cal.App.4th 1, 6 [87 Cal.Rptr.2d 554] (*Gibbs*).) Therefore, in construing the CFRA, California courts sometimes turn to federal decisions construing the FMLA. (See *Dudley, supra,* 90 Cal.App.4th at p. 261.)

ately take over where Paulenich had left off in the department. Paulenich presented Neisendorf with a proposed development plan, and explained that she must acknowledge the performance issues that were raised before her leave, and agree on a plan for moving forward.

Paulenich's letter terminating Neisendorf's employment dated November 26, 2002, sets forth what occurred next. It states in relevant part: "Unfortunately, we were unable to reach any form of agreement on the key development issues that were identified in your 2002 mid-year review. As I indicated, your unwillingness to acknowledge the existence of these performance issues and the critical nature they play in the success of yourself and your organization precludes us from having a basis on which we can move forward. Therefore, effective today you no longer work at LS&Co."

Following her termination, Neisendorf requested a meeting with Philip Marineau, LS&Co.'s president and chief executive officer. There, Neisendorf refused to accept any responsibility for the performance issues and blamed the problems on Paulenich. She asked to be reinstated without having to report to Paulenich, or alternatively, separation pay of $1 million. Marineau declined both proposals.

Neisendorf sued LS&Co. on May 23, 2003, pleading numerous causes of action, including gender discrimination, age discrimination, disability discrimination, wrongful termination, and retaliatory discharge. After a series of motions brought by LS&Co., both before and during trial, most of Neisendorf's claims were dismissed. The claims finally submitted to the jury rested on two theories: (1) that LS&Co.'s decision to terminate her employment was motivated by disability discrimination in violation of the FEHA; and (2) that LS&Co.'s decision to terminate her employment was in retaliation for taking medical leave under the CFRA.

By special verdict, the jury found the adverse employment action was not taken because of Neisendorf's exercise of her right to CFRA leave.[2] The jury also found Neisendorf was not a "disabled person" under the FEHA.[3] Because Neisendorf was not eligible for FEHA protection, LS&Co. had no accommodation obligation to Neisendorf under the FEHA, nor could she state

---

[2] The jury was asked: "Has Plaintiff proved that her taking a CFRA medical leave was a motivating reason for Levi Strauss & Co.'s decision to terminate her employment?" The jury responded, "No."

[3] The jury was asked: "Has Plaintiff proved that Levi Strauss & Co. knew or thought she had a mental condition, disease or disorder that limited her ability to participate in a major life activity?" The jury answered, "No."

a claim for wrongful termination in violation of the public policies embodied in that statute.

As noted, Neisendorf has raised no issues in this appeal concerning the jury's verdict; therefore, we are entitled to assume it is correct. She appeals two issues resolved by the trial court as matters of law; namely, (1) the court's dismissal of her claim for violation of the CFRA on the ground that she "failed to produce evidence that she was able to perform the essential job functions of her position within the [12-week] CFRA-protected period"; and (2) the court's finding that she was not entitled to any unpaid bonuses from LS&Co.

## III.

## DISCUSSION

### A. Cause of Action under the CFRA

At trial, but *before submission of the case to the jury*, the parties "stipulated to submit to the [trial] court" the second cause of action in Neisendorf's first amended complaint for violation of the CFRA. The court found Neisendorf had received all of the substantive protections she was entitled to under the CFRA. Consequently, the trial court dismissed Neisendorf's claim of interference with her substantive rights under CFRA and restricted her CFRA claim submitted to the jury to a single claim of retaliatory discharge for taking medical leave under the CFRA.

The CFRA is a portion of FEHA that provides "protections to employees needing family leave or medical leave. [Citations.]" (*Gibbs, supra,* 74 Cal.App.4th at p. 6; *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 606 [88 Cal.Rptr.2d 239] (*Nelson*).) The CFRA entitles eligible employees to take up to 12 weeks of unpaid medical leave during a 12-month period for certain personal or family medical conditions, including care for their children, parents, or spouses or to recover from their own serious health condition.[4] (Gov. Code, § 12945.2; *Nelson, supra,* 74 Cal.App.4th at p. 607.) CFRA's regulations provide that, for an employee to be entitled to a medical

---

[4] The employer is generally not required to pay an employee during leave taken pursuant to the CFRA, but may require the employee to substitute his or her accrued vacation leave and/or sick leave, if the employee takes a leave because of his or her own serious health condition. (Gov. Code, § 12945.2, subds. (d), (e); Cal. Code Regs., tit. 2, § 7297.5, subd. (b)(1), (3)(A); *Department of Fair Employment & Housing v. Verizon California, Inc.* (2003) 108 Cal.App.4th 160, 163 [133 Cal.Rptr.2d 258].)

leave for her own serious health condition, the condition must cause her to be unable to work at all or unable to perform one or more of the essential functions of her position. (Cal. Code Regs., tit. 2, § 7297, subd. (a)(2)(C).) An employee who takes CFRA leave is guaranteed that taking leave will not result in a loss of job security or in other adverse employment actions. (Gov. Code, § 12945.2, subd. (*l*); Cal. Code Regs, tit. 2, § 7297.7, subd. (a).)

After the 12 weeks of CFRA leave expires, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. (Gov. Code, § 12945.2, subd. (a); Cal. Code Regs., tit. 2, § 7297.2, subd. (a).) While an employer's duties under the FEHA include extending reasonable accommodations to an employee if reasonable accommodations will enable the employee to perform his or her essential duties (Gov. Code, § 12940, subd. (a)(1), (2)), there is no similar provision in the CFRA requiring an employer to provide reasonable accommodation to an employee returning from CFRA leave.[5]

In this case, there is no dispute that Neisendorf was an eligible employee covered by the CFRA, that LS&Co. was an eligible employer, and that Neisendorf took a 12-week CFRA medical leave for treatment of a covered medical condition. It is also uncontroverted that upon the expiration of her 12 weeks of CFRA leave, Neisendorf had still not returned to work because she was still unable to perform the essential functions of her job without reasonable accommodation. When agreed-upon workplace accommodations were finally put into place several weeks after the 12-week CFRA protected leave period ended, Neisendorf returned to work but was terminated the same day.

When the matter was argued below, LS&Co. contended that because Neisendorf was not released to return to work without accommodations at the end of her 12 weeks of CFRA leave, LS&Co. was no longer under an express statutory duty to reinstate her to her former position or to an equivalent position. The trial court agreed, finding: "[T]he plaintiff had no basis to proceed under the CFRA because she—when she was ready to return to work, it was on condition that certain accommodations be met, and that that's what took the time that brought—that put her beyond the 12 weeks was the discussions regarding accommodations. But under those facts, the court felt

---

[5] Under the FMLA, the CFRA's federal counterpart, once the 12-week period ends, an employee who remains "unable to perform an essential function of the position because of a physical or mental condition . . . has no right to restoration to another position under the FMLA. . . ." (29 C.F.R. § 825.214, subd. (b) (2003).)

that there was no claim that was viable or could be pursued by the plaintiff for violation of the [CFRA]."

The trial court's reasoning finds substantial support in cases decided under the FMLA holding that an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave. (See *Cehrs v. Northeast Ohio Alzheimer's Research Center* (6th Cir. 1998) 155 F.3d 775, 784–785 [finding no FMLA violation because the evidence was undisputed that the employee would not have been able to return to work by the statutory deadline]; *Williams v. Toyota Motor Mfg., Kentucky, Inc.* (6th Cir. 2000) 224 F.3d 840, 845, revd. on other grounds, 534 U.S. 184 [151 L.Ed.2d 615, 122 S.Ct. 681] (2002) [concluding that the employee had suffered no harm when she was terminated because she was unable to resume her duties by the end of the FMLA leave period]; *Nunes v. Wal-Mart Stores, Inc.* (N.D.Cal. 1997) 980 F.Supp. 1336, 1340–1341, revd. on other grounds, 164 F.3d 1243 (9th Cir. 1999) [employer properly asserts its right to terminate employee when she failed to return to work at the close of the 12-week period].)

On appeal, Neisendorf insists the court's ruling was in error and she should be "allowed to pursue her CFRA claim." However, Neisendorf has difficulty articulating exactly what type of claim was at issue in the case, and persuading us that a jury question was presented on the challenged issue. It is undisputed that LS&Co. accorded Neisendorf the full 12 workweeks of leave to which she was entitled under the CFRA. To the extent Neisendorf argues that LS&Co. should have reinstated her to her previous position after 12 weeks, such an argument ignores the critical fact that Neisendorf was never released to return to work without restrictions. There is no obligation under the CFRA that an employer provide accommodations to an employee in order to allow the employee to return to work within the 12-week period.[6]

Despite LS&Co.'s correct legal determination that it had no legal duty to accommodate under the FEHA, LS&Co. nonetheless worked with Neisendorf and her representatives to reach agreement on appropriate accommodations

---

[6] Although many arguments made in Neisendorf's opening brief seem to dispute this legal proposition, in her reply brief Neisendorf clarifies her argument and emphasizes that she "does *not* argue that CFRA 'requires' accommodations . . . ." (Italics added.) We note also that when this case was tried below, Neisendorf failed to prove an entitlement to protection from termination based on public policies expressed in the FEHA, as the jury determined that Neisendorf was not recognized as a "disabled" individual within the meaning of the FEHA. Thus, to the extent Neisendorf claimed LS&Co. subjected her to disability discrimination, such a claim failed because the jury found Neisendorf was not shown to be disabled. The jury's finding also doomed Neisendorf's failure-to-accommodate claim because the threshold showing of this claim requires the plaintiff be "disabled." Consequently, in this appeal Neisendorf has withdrawn all claims based on failure to accommodate and disability discrimination.

that would allow her to return successfully to work. After being out on medical leave for 14 weeks, the parties stipulated to agreed-upon accommodations and Neisendorf was reinstated to her job at the same level of pay and benefits, even though the CFRA did not impose a legal duty to reinstate her to her former position.

While Neisendorf claimed she was terminated in retaliation for asserting her CFRA rights, the jury rejected this claim, instead returning a verdict indicating she had failed to establish the requisite causal connection between her protected actions in taking a CFRA medical leave and the termination of her employment. (*Dudley, supra,* 90 Cal.App.4th at p. 261.) The evidence at trial revealed that prior to Neisendorf's departure on CFRA medical leave, she had well-documented performance issues, which preceded her alleged disability. It is undisputed that LS&Co. had announced its determination to address and resolve these performance issues with Neisendorf before she went on CFRA medical leave but deferred doing so until she returned to work. Her employment was promptly terminated the day she returned to work when it became clear that she still could not commit to working on the unacknowledged performance issues.

Under the regulations implementing the CFRA, an employee who requests CFRA leave or is on leave "has no greater right to reinstatement or to other benefits and conditions of employment" than an employee who remains at work. (Cal. Code Regs., tit. 2, § 7297.2, subd. (c)(1).) For this reason, even though she took CFRA leave, Neisendorf had no greater protection against her employment being terminated for reasons not related to her CFRA request than any other employee at LS&Co.

Neisendorf does not really challenge these points, but contends in her reply brief that LS&Co. "mischaracterizes" her claim under the CFRA. In significantly narrowing her CFRA claim, she offers a somewhat unclear argument of what issue under CFRA could possibly be left for a jury's consideration. To prevent a claim that we, too, have mischaracterized her CFRA argument, we liberally quote Neisendorf's reply brief. She claims that on this record "a jury could find that the Company never intended to return Neisendorf to work." She defines the critical issue as follows: "[W]hether an employer can do what the Company did here: agree to engage in the Interactive Process within the 12-week period, let that period expire, then refuse to allow the employee to return to work."[7] Stated another way by Neisendorf: "The issue is, when the employer engages in the Interactive Process starting during the

---

[7] The "interactive process" referred to in Neisendorf's argument is the exchange between employer and employee to reach an agreement regarding accommodations as described by courts interpreting the Americans with Disabilities Act (ADA) (42 U.S.C. § 12111 et seq.; 29 C.F.R. § 1630.2(*o*)(3) (2000)). This term has been adopted by California courts to describe

12-week CFRA period and extending beyond that period, does the CFRA right of reinstatement continue beyond the 12 weeks?"

We agree with LS&Co. that Neisendorf cannot proceed with this purported CFRA claim. In attempting to generate some sort of jury question under the CFRA, Neisendorf cannot overcome the legitimate, nondiscriminatory reason for LS&Co.'s decision to terminate her employment. The trial court made extensive findings in its written statement of decision, which are not challenged on appeal, that Neisendorf was terminated for reasons having nothing to do with taking a CFRA leave or her alleged disability: "The evidence at trial also clearly established that Plaintiff's employment was terminated for unsatisfactory performance and gross misconduct. Abundant testimony and documentation were presented showing that Plaintiff's employment was terminated when she received an unsatisfactory performance evaluation from her immediate supervisor and refused to accept or address the performance deficiencies set forth in the evaluation. [Citations.] This was acknowledged by Plaintiff herself. [Citations.] Thus, the termination was directly related to Plaintiff's performance at LS&Co."

■ The unchallenged finding that LS&Co. had a legitimate, nondiscriminatory reason to discharge Neisendorf, which had nothing to do with her CFRA leave, bars Neisendorf from articulating a cognizable cause of action for the jury's consideration based on LS&Co.'s alleged refusal to honor the CFRA's right to reinstatement. ■ Several federal courts, interpreting the FMLA, endorse this principle. (See *Arban v. West Pub. Corp.* (6th Cir. 2003) 345 F.3d 390, 401 ["An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."]; accord, *Throneberry v. McGehee Desha County Hosp.* (8th Cir. 2005) 403 F.3d 972, 979 ["As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."].) Consequently, because LS&Co.'s legitimate, nondiscriminatory reason for terminating Neisendorf's employment eliminated any obligation LS&Co. might have had to reinstate her, the court correctly held she could not state a valid claim under the CFRA.

## B. Neisendorf's Entitlement to Bonus Payments

The parties also stipulated that the court could determine Neisendorf's sixth cause of action claiming entitlement to bonus payments under

the exchange mandated under the FEHA as well. (See *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 821 [111 Cal.Rptr.2d 87, 29 P.3d 175].)

LS&Co.'s "Annual Incentive Plan" (AIP) and "Leadership Shares Plan." LS&Co.'s AIP is an annual bonus based on both individual and company performance. While there is a target amount established each year for every employee, the actual payout could be zero. To be eligible for an AIP bonus where there is a payout, an individual must meet the plan's eligibility requirements, which are described in the plan documentation. Payment eligibility is described as follows: "Unless termination is due to retirement, layoff, long-term disability or death, *a participant must be an active employee of the company on the payment date in order to receive an AIP payment.* AIP payments are generally made in February following the close of the fiscal year." (Italics added.) The AIP plan further states: "*If an employee is involuntarily discharged (e.g. poor performance or misconduct) prior to the AIP payment date, that employee will have no right to AIP.*" (Italics added.)

Eligibility under the Leadership Shares Plan works similarly. The Leadership Shares Plan is a long-term incentive plan that provides for potential payouts to eligible employees for each of years three, four and five of the plan if certain company performance goals are met. In some years, such as 2002, there was a payout. However, in other years, such as 2003 and 2004, there was no payout. "Leadership Shares" are not assigned a value until determination of LS&Co.'s financial performance and approval by LS&Co.'s board of directors in January or February of the following year.

Like the AIP plan, the Leadership Shares Plan clearly articulates ineligibility upon termination: "*If a Participant's employment is terminated for unsatisfactory performance or for gross misconduct* as that term is defined in the Human Resources Procedures manual, . . . *prior to any Award Payment Date, the Participant will not be entitled to receive any Leadership Shares,* vested or otherwise, and no additional payouts will be made." (Italics added.)

After posttrial briefing, the court found in favor of LS&Co., ruling that Neisendorf failed to prove that she was eligible to receive any of the bonus payments claimed. The trial court found the "undisputed evidence at trial was that both the AIP bonus payout for fiscal year 2002 and the Leadership Shares payout for fiscal year 2002 . . . occurred in February 2003. Plaintiff's employment with LS&Co. was terminated [for unsatisfactory performance and gross misconduct] on November 26, 2002, well before the bonus payout dates." Consequently, the court concluded that "under the terms of the AIP plan and the Leadership Shares plan, Plaintiff was not entitled to a bonus payment." There is no extrinsic evidence offered to interpret the agreement and the facts are undisputed, hence, we review the trial court's decision de

novo. (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 196 [127 Cal.Rptr.2d 847].)

Neisendorf does not dispute the trial court's conclusion "that the plans' terms purport to declare her ineligible." Instead, she claims that although the unambiguous terms of the AIP plan and the Leadership Shares Plan require that she be an employee of LS&Co. on the payment date, she nevertheless is eligible for the bonuses, because LS&Co.'s "bonus-plan provisions declaring Neisendorf ineligible to receive the bonuses she had earned violate the Labor Code and are thus void."

■ As Neisendorf correctly points out, bonuses are considered "wages" within the meaning of Labor Code section 200. (*Lucian v. All States Trucking Co.* (1981) 116 Cal.App.3d 972, 975 [171 Cal.Rptr. 262] (*Lucian*); *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 44 [100 Cal.Rptr. 791].) She claims the public policy of this state, as expressed in the statutes governing wages, obligates LS&Co. to pay her the bonuses despite her manifest ineligibility under the written terms of the bonus plans. Neisendorf contends that the bonus plans' requirement that she "remain employed until an unspecified, discretionary future payment date" is unenforceable, because the public policy inherent in Labor Code section 200 requires certainty in wage provisions. She argues that the bonus payments were part of her bargained-for compensation for services rendered during fiscal year 2002, and the public policy of this state prohibits an employer from forfeiting such compensation when the employee works for the entire period of profits upon which the bonus was based, but does not work until "an indeterminate date" in fiscal year 2003 when the bonus payments are actually made. Essentially, Neisendorf contends that forfeiture of the bonus payments in this case was akin to illegal withholding or depriving her of wages that she had earned.

We find nothing in the public policy of this state concerning wages that transforms Neisendorf's contingent expectation of receiving bonuses into an entitlement. The cited statutes governing wages, and prohibiting an employer's unilateral act to cause a forfeiture of wages, are manifestly applicable when wages have been promised as part of the compensation for employment and all conditions agreed to in advance for earning those wages have been satisfied. Likewise, once a bonus has been promised as part of the compensation for service, and the employee fulfills all the agreed-to conditions, the promised bonus is considered wages that must be paid. Consequently, defining bonuses as wages protects an employee's expectation of promised remuneration and prevents the employer from arguing that the promised bonus was an unenforceable gift or gratuity. (See *DiGiacinto v.*

*Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 635 [69 Cal.Rptr.2d 300] (*DiGiacinto*); *Hunter v. Sparling* (1948) 87 Cal.App.2d 711, 723 [197 P.2d 807].)

In this case, there was no promise made to Neisendorf that she would earn the AIP and Leadership Shares bonuses simply by working for LS&Co. during the fiscal year. LS&Co. expressly tied the payment of an AIP bonus and Leadership Shares bonus to a measurable benchmark. The language of both bonus plans required that she not be terminated for cause before the payout date.[8]

Neisendorf's eligibility for bonus payments is properly determined by the bonus plans' specific terms and general contract principles. California courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services *in accordance with the terms of the plan*, a binding contract is formed under which the employer is obligated to deliver the promised benefits. (See *DiGiacinto, supra*, 59 Cal.App.4th at p. 635; *Newberger v. Rifkind* (1972) 28 Cal.App.3d 1070, 1076–1077 [104 Cal.Rptr. 663]; *Sabatini v. Hensley* (1958) 161 Cal.App.2d 172, 175 [326 P.2d 622]; *Frebank Co. v. White* (1957) 152 Cal.App.2d 522, 525–526 [313 P.2d 633]; *Chinn v. China Nat. Aviation Corp.* (1955) 138 Cal.App.2d 98, 101 [291 P.2d 91].)

A case illustrating these principles is *Lucian, supra*, 116 Cal.App.3d 972. In *Lucian*, the written employment plans at issue provided for a bonus that would be calculated and paid in full at the end of the calendar year, but specified that employees who voluntarily left the company before the bonus calculation date would not be entitled to the bonus. (*Id.* at pp. 974–975.) Three employees who departed voluntarily before the end of the year claimed entitlement to the bonus. As the *Lucian* court noted, "a specific bonus plan normally becomes binding as a unilateral contract when the employee begins performance, in the sense that the plan then cannot be revoked by the employer." (*Id.* at p. 976.) Each plan at issue "had been consistently interpreted and applied to preclude [the] vesting of any benefits unless the

---

[8] Numerous cases have upheld the bonus formula in this case, holding that an employee discharged for good cause is not entitled to participate in the distribution of the proceeds of a bonus plan. (See Annot., Rights and Liabilities as Between Employer and Employee with Respect to General Bonus or Profit-Sharing Plan (1962) 81 A.L.R.2d 1066, p. 1079 ["And where an employee was discharged for good cause prior to distribution of the proceeds of a general bonus or profit-sharing plan, it has been held that the discharged employee was not entitled to participate in the fund."]; see also 30 C.J.S. (1992) Employer-Employee § 148, p. 221 ["[I]t has also been held that a bonus plan whereby bonus payments are made only to employees employed as of the date of payment is not invalid as an improper forfeiture or penalty imposed on employees discharged prior to the payment date."].)

participant completed the current calendar year in the service of his employer." (*Id.* at p. 975.) The *Lucian* court concluded that summary judgment was properly granted in the employer's favor because "an employee who voluntarily leaves his employment before the bonus calculation date is not entitled to receive it." (*Ibid.*)

Neisendorf suggests the law is different in a case such as hers, which involves an involuntary termination as opposed to the voluntary departure in *Lucian.* However, a case involving involuntary termination was analyzed in *Hunter v. Sparling, supra,* 87 Cal.App.2d 711, using the same contractual framework. "[T]he offer was to pay a bonus to those still in the employ on December 31, 1918. That offer could be accepted only by performing the act requested, namely, remaining in the employ until that date. The employee was fired before that date, so the act required was never performed. The unilateral contract never came into existence." (*Id.* at p. 724.)

Neisendorf was aware of the terms and conditions of the AIP and Leadership Shares bonus plans, and her performance of services for LS&Co. signified acceptance of its terms.[9] However, the formation of a binding contract, which would obligate LS&Co. to deliver Neisendorf the bonus payments, would occur only upon Neisendorf's completion of the required service as specified under the terms of the plans. Since Neisendorf did not perform the required service, and she was terminated for cause before the bonus payout date, LS&Co. was not obligated to pay her a bonus under the AIP plan and the Leadership Shares Plan for the 2002 fiscal year.[10]

---

[9] The trial court made extensive findings, which are not challenged on appeal, regarding Neisendorf's, knowledge and acceptance of the plans' terms. "Plaintiff was a sophisticated business woman who was hired into the second highest human resources position at LS&Co. worldwide. . . . She had her own consulting business when she was recruited by LS&Co. . . . and was represented by counsel during the negotiation of her employment with LS&Co. . . . The testimony revealed that Plaintiff was very involved in negotiating the terms of her employment. . . . In addition, with respect to the Leadership Shares, the uncontroverted testimony of Plaintiff's supervisor, Fred Paulenich, was that he informed Plaintiff upon hire how the Leadership Shares would work, and made explicitly clear that she would only receive the Leadership Shares if she were at the Company when they paid out. . . ."

[10] We express no opinion on whether the result would be same in this case if the jury found Neisendorf was wrongfully discharged. We merely note, "[t]he law does not support a forfeiture in these circumstances where the employees were terminated through no fault of their own after having substantially performed the services entitling them to a bonus. [Citations.]" (*Division of Labor Law Enforcement v. Transpacific Transportation Co.* (1979) 88 Cal.App.3d 823, 830 [152 Cal.Rptr. 98].) Also, the question of fraud or bad faith is not before us, because there is no allegation Neisendorf was discharged for the specific purpose of depriving her of whatever rights she had acquired in the bonus plans.

## IV.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to LS&Co.

Reardon, J., and Rivera, J., concurred.