[No. H034618. Sixth Dist. Aug. 5, 2011.]

ERIC PATON et al., Plaintiffs and Appellants, v.
ADVANCED MICRO DEVICES, INC., Defendant and Respondent.

1508

**COUNSEL**

Gergosian & Gralewski, Edward M. Gergosian, Robert J. Gralewski, Jr., Clarissa E. Riley, Eric J. Sidebotham, Daniel M. Shafer; Law Offices of Russell J. Hanlon and Russell J. Hanlon for Plaintiffs and Appellants.

Orrick, Herrington & Sutcliffe, Lynne C. Hermle and Michael A. Aparicio for Defendant and Respondent.

**OPINION**

**PREMO, J.—**

I. *Introduction*

Plaintiff Eric Paton, on behalf of himself and a class of others similarly situated, sued his former employer, defendant Advanced Micro Devices, Inc., alleging that defendant had failed to pay him for an eight-week sabbatical he had earned but not used by the time he resigned. Under defendant's sabbatical policy, salaried employees with seven years of service were eligible for an eight-week fully paid sabbatical. The leave was forfeited if the employee did not use it before employment terminated.

Plaintiff claimed that defendant's sabbatical program was really just extra vacation and under Labor Code section 227.3,[1] an employer may not require an employee to forfeit vested vacation pay. Citing *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774 [183 Cal.Rptr. 846, 647 P.2d 122] (*Suastez*), plaintiff claimed that his right to the sabbatical had vested over the seven years he worked for defendant and, therefore, he was entitled to be paid for it when he resigned. Class members who had worked for less than seven years were entitled to be paid for the unused sabbatical in proportion to the time they had worked.

The trial court granted defendant's motion for summary adjudication (Code Civ. Proc., § 437c), finding, as a matter of law, that the sabbatical program offered a true sabbatical that was not subject to section 227.3 and *Suastez*. We conclude that on this record the issue cannot be decided as a matter of law. Accordingly, we shall reverse.

## II. *Legal Framework*

Under sections 201 and 202, an employer must pay an employee all wages earned and unpaid at the time, or soon after, employment terminates. (§§ 201, subd. (a), 202, subd. (a).) Although an employer is not required to offer paid vacations, if the employer does offer vacation, section 227.3 provides that if an employee is terminated without having taken his vested vacation time, "all vested vacation shall be paid to him as wages at his final rate . . ." and the employer's policy "shall not provide for forfeiture of vested vacation time upon termination."[2]

*Suastez* explained what section 227.3 meant by "vested vacation time." In *Suastez*, the employer's vacation policy provided that employees were entitled to an annual paid vacation but the employee did not become eligible for the vacation until the employee's anniversary date. Suastez's employment was terminated prior to his anniversary date. He asked to be paid for the vacation time he had earned between his anniversary date and his last day of

---

[1] Further unspecified section references are to the Labor Code.

[2] Section 227.3 provides in full: "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination. The Labor Commissioner or a designated representative, in the resolution of any dispute with regard to vested vacation time, shall apply the principles of equity and fairness."

work but the employer refused. Suastez sued, seeking, among other things, a declaration that the company's refusal to pay him a pro rata share of his vacation pay violated section 227.3. (*Suastez, supra,* 31 Cal.3d at pp. 776–777.)

■ The employer in *Suastez* argued that under its vacation policy employment on the anniversary date was a condition precedent to the vesting of the vacation benefit. If employment was terminated before the anniversary date, vacation was not vested and, therefore, the employee was not entitled to be paid for it. The Supreme Court rejected the argument. "The consideration for an annual vacation is the employee's year-long labor. Only the time of receiving these 'wages' is postponed." (*Suastez, supra,* 31 Cal.3d at p. 779.) Vacation pay, if it is offered, is a type of deferred compensation, which vests pro rata as the employee renders the services for which he was employed. (*Id.* at p. 781.) "[O]nce it is acknowledged that vacation pay is not an inducement for future services, but is compensation for past services, the justification for demanding that employees remain for the entire year disappears. If some share of vacation pay is earned daily, it would be both inconsistent and inequitable to hold that employment on an arbitrary date is a condition precedent to the vesting of the right to such pay." (*Id.* at p. 782.) The requirement that the employee remain until his anniversary date was, in effect, a condition subsequent that purported to extinguish a right already earned. Such a provision is void under section 227.3.[3]

After *Suastez* was decided, the California State Labor Commissioner (Labor Commissioner) was concerned that employers might decide to offer sabbaticals as a "subterfuge" to avoid having to pay vested vacation time to departing employees. On the other hand, as the Labor Commissioner implicitly recognized, some employers undoubtedly wanted to offer sabbaticals for legitimate reasons. The problem was that *Suastez* could be read to apply to many of the sabbatical programs that had become popular in the business sector, which were granted after a set number of years and did not require the employee to engage in any job-related pursuit while away from work. Requiring an employee to work for a period of time in order to be eligible to take a paid leave sounded much like the deferred vesting policy *Suastez* had rejected as an impermissible condition subsequent. The Labor Commissioner grappled with the question whether a sabbatical which was conditioned only upon a period of service and which did not require the employee to account for his use of the time away could ever be exempt from *Suastez.*

---

[3] Neither section 227.3 nor *Suastez* prohibit an employer from imposing a waiting period before new employees may begin earning vacation. (*Owen v. Macy's, Inc.* (2009) 175 Cal.App.4th 462, 471 [96 Cal.Rptr.3d 70].) That was not the issue in *Suastez,* nor is it an issue in this case.

In attempting to answer the question the Labor Commissioner issued a series of three opinion letters in 1986 and 1987. The first of these letters broadly stated that the California Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) would find a sabbatical program to be exempt from *Suastez* if, "the sabbatical leave is substantially longer than the normal vacation period and is not in lieu of vacation. Also, the sabbatical should be granted only after a substantial period of employment. [¶] The point is that each case will have to be decided on its own facts. Generally speaking, [the DLSE] will not consider a traditional sabbatical arrangement (i.e., 4 months off after 7 years), to require proration." (DLSE, Opn. Letter No. 1986.12.13 <http://www.dir.ca.gov/dlse/opinions/1986-12-13.pdf> [as of Aug. 5, 2011].)

 The second letter gave more detailed guidance and set forth what we shall refer to as the DLSE test: "[I]n order for a sabbatical not to be subject to [section] 227.3 and *Suastez*, the following criteria must be met. [(1)] The sabbatical must be for an extended period of time beyond what is normally granted for vacation. [(2)] It cannot replace or displace the vacation normally earned each year but must be in addition to a regular vacation program. [(3)] Sabbatical leave may only be provided to high level managers and professionals in advanced fields. [(4)] Finally, sabbatical leave should be granted infrequently, such as every 7 years, though in certain circumstances a shorter period may be acceptable." (DLSE, Opn. Letter No. 1987.07.13-1 <http://www.dir.ca.gov/dlse/opinions/1987-07-13-1.pdf> [as of Aug. 5, 2011], underscoring omitted, italics added.) The third letter stated that sabbatical programs "available across the board to all employees" would be considered vacation. (DLSE, Opn. Letter No. 1987.10.06 <http://www.dir.ca.gov/dlse/opinions/1987-10-06.pdf> [as of Aug. 5, 2011].)

To date, no published appellate opinion has adopted or interpreted the DLSE test or the Labor Commissioner's opinions on the issue. Much of the present dispute involves the validity of that test.

III. *Procedural Background*

The trial court certified this matter as a class action. The class is defined as all salaried employees of defendant who were terminated after April 27, 2003, did not sign a release, and were not paid for a sabbatical benefit that was unused when their employment terminated. A total of 1,432 class members received notice of the action and have not excluded themselves from it.

The complaint contains six class-related causes of action and one independent claim. The first cause of action is a class claim for nonpayment of wages under section 227.3. The second, third, and fourth causes of action are for waiting time penalties (§§ 202–203) and unfair business practices (Bus. & Prof. Code, § 17200 et seq.), and the sixth and seventh are for equitable remedies. All the class claims depend upon the viability of the first cause of action and the assertion that the sabbatical is really disguised vacation that cannot be forfeited. The fifth cause of action was plaintiff's individual claim for breach of contract.

Shortly before trial defendant filed a motion for summary judgment or, in the alternative, summary adjudication. The motion was based upon the argument that defendant's sabbatical benefit "is not vacation within the meaning of Labor Code section 227.3."

Without expressly listing the four points of the DLSE test, and acknowledging that the test was not controlling, the trial court found that defendant's sabbatical policy "meets all of these guidelines as a matter of law." The court explained that the length of the leave was sufficient to qualify as a sabbatical and that the program was "consistent with other provision[s] of California Law that address sabbatical programs" such as California Rules of Court, rule 10.502 and Unemployment Insurance Code, former section 12102.[4] The trial court granted summary adjudication of all but plaintiff's individual cause of action. Plaintiff withdrew his individual claim and judgment was entered in favor of defendant. This timely appeal followed.

## IV. *Standard and Scope of Review*

Plaintiff argues that the trial court erred in concluding, as a matter of law, that the leave is a true sabbatical. Plaintiff maintains that the trial court did not properly apply the DLSE test and that the undisputed facts show that defendant's sabbatical policy does not meet the test. Defendant argues that the DLSE test is not controlling and that its policy conforms to the requirements of section 227.3.

We review the trial court's determination de novo, viewing the evidence in the light most favorable to plaintiff. (*Schachter v. Citigroup, Inc.* (2009) 47

---

[4] California Rules of Court, rule 10.502 contains the procedure for granting judicial sabbaticals in California. Former section 12102 of the Unemployment Insurance Code concerned the concept of "leisure sharing," a job-creation strategy by which full-time workers would voluntarily reduce their hours to create additional employment opportunities for other workers. The section has been repealed. (Stats. 2010, ch. 678, § 8.)

Cal.4th 610, 618 [101 Cal.Rptr.3d 2, 218 P.3d 262].) We apply the same rules the trial court applied. Defendant has the initial burden of showing that one or more elements of the cause of action cannot be established or that there is a complete defense to it. (Code Civ. Proc., § 437c, subd. (p)(2).) If defendant is able to make that showing the burden shifts to plaintiff to show that a triable issue of one or more material facts exists as to the cause of action or defense. (*Ibid.*) "If the evidence is in conflict, the factual issues must be resolved by trial." (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 [89 Cal.Rptr.2d 540].)

We may affirm the granting of a summary adjudication motion only if we find that the evidence is incapable of supporting a judgment for plaintiff. "Thus even though it may appear that a trial court took a 'reasonable' view of the evidence, a summary judgment cannot properly be affirmed unless a contrary view would be unreasonable as a matter of law in the circumstances presented." (*Binder v. Aetna Life Ins. Co., supra*, 75 Cal.App.4th at p. 838.) That is, we may affirm only if reasonable minds could draw but one conclusion from the evidence. (*Gilbertson v. Osman* (1986) 185 Cal.App.3d 308, 318 [229 Cal.Rptr. 627].)

V. *The Evidence*

Defendant established its sabbatical program in 1988. Under the original program all full-time salaried employees were "eligible" for an eight-week sabbatical after seven years of service.[5] Scheduling the sabbatical was subject to numerous conditions. Among other things, employees were required to inform their supervisors of their intent to take a sabbatical. If the employee was on a current written warning, he or she had to "achieve required performance standards" before taking the sabbatical. Management could postpone a scheduled sabbatical for business reasons. The sabbatical had to be taken within two years of eligibility. And employees "who terminate and

---

[5] The earliest version of the "Sabbatical Program" appearing in the record is dated October 1, 2002. It reads in full as follows:

"Purpose: [¶] To encourage continued employment with [defendant] by providing time away from work for enrichment and revitalization.

"Policy: [¶] [Defendant's] sabbatical program provides salaried (exempt) employees who have seven or more years of credited service the opportunity to have an extended period of paid time away from work.

"Procedure:

"A. All regular salaried (exempt) employees who work at least 80 hours per pay period are eligible for an eight-week sabbatical at regular pay after every seven years of credited service. [Part time employees are eligible for a prorated leave.] Service prior to June 28, 1988 will not be counted for more than one sabbatical eligibility.

have not taken their sabbatical forfeit their eligibility." While on sabbatical, an employee continued to accrue regular vacation time and would return to his or her same job when the sabbatical was over. One declarant explained that sabbaticals were supposed to be "scheduled at least three months in advance" and "often employee's duties are assigned to others to ensure that all duties are taken over while the employee is absent."

As set forth in the written policy, the express purpose of the sabbatical program was to "encourage continued employment with [defendant] by providing time away from work for enrichment and revitalization." One of

"B. Employees must be on active status for at least three consecutive months before beginning a sabbatical. A sabbatical may start after the end of a medical leave with management approval. A personal leave of absence may not be used to extend the length of the sabbatical.

"C. If an employee needs to take a protected leave while on sabbatical, they [sic] must notify the Leave of Absence Administrator. . . .

"D. Rehired employees must be active for at least twelve (12) months after their rehire date before beginning a sabbatical.

"E. Employees who become eligible for a sabbatical while on assignment outside of the U.S. can not [sic] take the sabbatical until reassigned to the U.S. . . .

"F. Employees who are transferred to the U.S. will have their prior credited service counted toward their eligibility for a sabbatical benefit. . . .

"G. Vacation may not be combined with the sabbatical except in exceptional circumstances with prior approval of the designated Vice President.

"H. Employee's vacation time will continue to accrue while on a sabbatical.

"I. Any company paid holiday which falls on the employee's normal workday during the sabbatical will extend the sabbatical by as many days as the paid holiday.

"J. The sabbatical must be taken within two years of eligibility. If a sabbatical is not started within two years of the employee's eligibility date, the employee forfeits the sabbatical and must wait until eligible for his/her next sabbatical.

"K. Management has the right to postpone the scheduling of sabbaticals due to business reasons, but such postponement must not extend beyond the two-year window. If exceptional business conditions require postponing the beginning of the sabbatical past its expiration date, a written request, signed by the employee's manager, the division VP and the division HR Representative must be sent to the Corporate Benefits Manager for approval.

"L. Employees must wait at least 36 months after taking a sabbatical before beginning another sabbatical.

"M. Employees should notify their supervisor of their intent to take a sabbatical at least three months in advance of the start date by completing a sabbatical request form and submitting it to their supervisor. . . .

"N. Employees on a current written warning must successfully achieve required performance standards prior to scheduling or taking their sabbatical.

"O. Salaried (exempt) employees who become eligible for a sabbatical and then change to hourly (non-exempt) status prior to taking the sabbatical will remain eligible for a sabbatical.

"P. While on sabbatical, employees remain on active status and are entitled to all current AMD benefits both insured and accrued. Employees on sabbatical will return to their same job.

"Q. Employees who terminate and have not taken their sabbatical forfeit their eligibility.

"R. Should an employee terminate while on sabbatical, all sabbatical benefits will end two weeks from the date the employee gives notice."

defendant's vice-presidents described the program as a "point of differentiation" for the company, making it "attractive to potential or current employees." Another declarant explained that, because it operates in "one of the most competitive environments in the world—that of Silicon Valley chip designers—[defendant] must retain valued employees, who are in high demand." Employees like plaintiff are frequently recruited by competitors. Accordingly, defendant offers extensive benefits, "many of which are designed to encourage employees to stay" with defendant. Defendant's 2006 benefits brochure listed the many employee benefits the company offered, including, for "[e]xempt employees," an "8-week, company-paid sabbatical," for which the employee is eligible "[a]fter seven years of credited service."

Defendant revised the sabbatical policy twice. In 2006, defendant changed the program to allow eligible employees the option of taking their sabbatical as two 4-week leaves. In 2007, defendant shortened the length of the sabbatical to four weeks after five years of service. Other provisions of the policy remained substantially the same as the earliest version. Defendant abandoned the program altogether in 2009.

At all pertinent times, defendant had a vacation policy in addition to the sabbatical program. The stated purpose of the vacation policy was to "provide compensation for employees who take time off for vacation." Employees earned two weeks of vacation per year for the first two years of service. The benefit increased yearly to a maximum of four weeks per year at the beginning of the eighth year of service. Employees with eight years of service could accumulate as much as eight weeks of vacation time. Taking a vacation required approval by the "authorized Time Approver." Managers could reschedule vacation as needed. The vacation policy does not say whether the employee continued to earn vacation time while on vacation; it does say that vacation does not accrue "for employees who are on a paid or unpaid Leave of Absence." While not part of the written policy, defendant's evidence showed that when an employee is on vacation, "his or her position and duties are typically not performed by an assigned replacement."

Plaintiff produced evidence to show that he had worked for defendant as a salaried employee for approximately eight years, from 1997 until 2005. Prior to accepting employment with defendant, plaintiff was aware of the sabbatical program. He knew about the program from the first interview, when the interviewer described the sabbatical program as "a nice little perk." Plaintiff also knew that he had to work for seven years in order to take the sabbatical but he was not aware of the policy's forfeiture-upon-termination provision. During the course of his employment, plaintiff was recruited by other firms but did not pursue them because he liked defendant and he knew that if he left before he had worked for seven years he would not get to take his sabbatical.

After having worked for defendant for more than seven years, plaintiff planned to take his sabbatical but was asked to defer it for business reasons. He was later placed on a performance improvement plan, further delaying his opportunity to take the eight weeks off. Plaintiff was frustrated. The performance improvement plan set goals that plaintiff described as "unobtainable." Plaintiff decided to resign, believing his job "would have been living hell" if he had stayed. He was surprised to learn that he would not be paid for the eight-week sabbatical he had not used.

After learning that he would not be paid for the sabbatical he had not taken, plaintiff filed a complaint with the DLSE, alleging that defendant had failed to pay wages due. The DLSE denied the claim.

## VI. *Discussion*

The factual question before the trial court was whether defendant's sabbatical policy was a legitimate sabbatical or regular vacation within the meaning of section 227.3. The distinction between the two types of leave has not been clarified either legislatively or judicially in this state. Accordingly, the threshold question before us is how to distinguish a legitimate sabbatical from regular vacation. The four-point DLSE test was designed to identify a sabbatical. But before we consider whether the test correctly characterizes a legitimate sabbatical, we look first for a definition of "vacation." After all, plaintiff's burden at trial would be to prove the principal allegation of his complaint, which is that the eight-week leave is regular vacation. Accordingly, we begin with the question: What is "vacation" within the meaning of section 227.3?

### A. *The Nature of "Vacation"*

■ Neither section 227.3 nor *Suastez* defines the term "vacation" but we may glean some basic elements from the implications of *Suastez* itself. The basis for the *Suastez* holding is the Supreme Court's characterization of vacation as deferred compensation. The *Suastez* concept of a paid vacation is that it is a concurrently earned component of an employee's wages. (*Suastez, supra,* 31 Cal.3d at pp. 780–781.) As one court explained it, "After *Suastez,* there is no question that an employee whose compensation package includes a 2-week paid vacation in a particular year is earning the monetary equivalent of 52 weeks of pay for a 50-week work year." (*Henry v. Amrol, Inc.* (1990) 222 Cal.App.3d Supp. 1, 5 [272 Cal.Rptr. 134].) Thus, vacation, when offered, is part of the employee's basic compensation package and is typically earned in proportion to the length of employment, such as two weeks per year, 12 hours per month, or some other ratio of paid time off to length of service.

Because vacation is deferred compensation, earning it is not conditioned upon anything other than the employee's rendering services for the employer. In particular, vacation does not require the employee to be employed for a specified period of time before he becomes eligible for vacation. *Suastez* explicitly rejected what it termed the "outdated notion" that vacation pay was " 'an inducement to the plaintiff to continue in defendant's employ.' " (*Suastez, supra,* 31 Cal.3d at p. 782.) In contrast, incentive compensation such as cash bonuses or stock option plans may be used as an " ' "inducement to employees to procure efficient and faithful service." ' " (*Schachter v. Citigroup, Inc., supra,* 47 Cal.4th at p. 621.) The right to such compensation does not vest pro rata but is payable to the departing employee only if the employee has met the requirements of the particular incentive plan. (*Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 521 [49 Cal.Rptr.3d 216].)

■ Vacation is also different from paid time off that is conditioned upon the occurrence of a specific event or granted for a particular purpose. For example, some employers give paid time off for state or federal holidays. The right to this type of time off does not vest with day-to-day employment; it vests upon the occurrence of the holiday. In a similar vein, some employers offer paid time off for illness, bereavement, or other specific reasons. The employee's right to this type of leave vests when the reason for the leave arises, as when the employee falls ill or a family member dies. (See 1 Advising Cal. Employers and Employees (Cont.Ed.Bar 2011) Vacations, Family and Medical Leave, and Other Time Off, §§ 6.9–6.12, pp. 534–538; see also DLSE, Opn. Letter No. 1990.09.24, p. 3 <http://www.dir.ca.gov/dlse/opinions/1990-09-24.pdf> [as of Aug. 5, 2011].) Furthermore, with these conditional types of leave, the employee is typically expected to use the leave for the identified purpose. But with vacation, the employee may use the time off for any purpose.

■ We take from the foregoing a rough idea of what constitutes vacation. It is paid time off that accrues in proportion to the length of the employee's service, is not conditioned upon the occurrence of any event or condition, and usually does not impose conditions upon the employee's use of the time away from work. (See DLSE, Opn. Letter No. 1990.09.24 <http://www.dir.ca.gov/dlse/opinions/1990-09-24.pdf> [as of Aug. 5, 2011] ["Leave time which is provided without condition is presumed to be vacation no matter what name is given to the leave.]")

B. *Sabbaticals*

■ In contrast to regular vacation, sabbatical leave, as it originated in the academic setting, is a conditional type of paid leave. The dictionary definition

of "sabbatical" is "a period of paid leave granted to a university teacher for study or travel (traditionally one year for every seven years worked)." (Concise Oxford English Dict. (11th ed. 2004) p. 1262, col. 2.)[6] Sabbaticals are usually granted for one academic semester or for a full year. During the sabbatical the faculty member engages in a project intended to promote his or her professional development and, in turn, enhance the institution's status as an institute of higher learning. (Boening & Miller, *Research and Literature on the Sabbatical Leave: A Review* (U. Ala., Higher Education Administration Program 1997) <http://eric.ed.gov/PDFS/ED414777.pdf> [as of Aug. 5, 2011].) Sabbaticals are granted with the expectation that the faculty member will return to the employing institution and put his or her newly acquired expertise to use there after the sabbatical is over. (*Ibid.*) Thus, traditional sabbaticals are like special-purpose, conditional types of leave in that the employee is expected to use time for the identified purpose. They also have an incentive component to the extent they encourage the employee to continue in the service of the institution that provides the opportunity for professional growth.

California's judicial sabbatical program is an example of the traditional academic sabbatical in a nonacademic setting. In order to be eligible for a sabbatical a judicial officer must have at least seven years of service, cannot have taken a sabbatical within seven years of the last sabbatical, and must agree to continue to serve as a judicial officer for at least three years after the sabbatical. (Cal. Rules of Court, rule 10.502(b)(1).) The judicial officer must submit an application to take a sabbatical. The application must include a description of the sabbatical project. (*Id.*, rule 10.502(c)(2)(C).) The sabbatical application is granted or denied depending, among other things, upon whether the sabbatical "will benefit the administration of justice in California and the judge's performance." (*Id.*, rule 10.502(e)(2)(A).)

### C. *Exempting Corporate Sabbaticals from Section 227.3 and* Suastez

Paid leave programs called sabbaticals used by businesses in the private sector are typically shorter and more frequent than traditional academic sabbaticals and many do not require the employee to have any particular purpose or to account for how his or her time is spent while on leave. The leave is given for employees to simply " 'recharge their batteries.' " (Schwartz, *The Corporate Sabbatical* (Nov. 15, 1999) CNN Money

---

[6] The word sabbatical "originates in Mosaic law and the edict that the land should be left fallow and debtors released from prison every seven years." (Heery & Noon, A Dictionary of Human Resource Management (Oxford University Press, 2008) Oxford Reference Online <www.oxfordreference.com/views/ENTRY.html?subview=Main&entry=t162.e1790> [as of Aug. 5, 2011].)

<http://money.cnn.com/1999/11/15/life/q_sabbatical/> [as of Aug. 5, 2011].) Of course, employees may use vacations for the same purpose. Not surprisingly, it was these nonacademic sabbaticals that concerned the Labor Commissioner when he devised the DLSE test.

By attempting to incorporate the characteristics of a traditional sabbatical into the DLSE test, the Labor Commissioner implicitly recognized that legitimate sabbaticals would be those that were designed to achieve purposes similar to the purposes for which traditional sabbaticals are used, namely to provide incentive for experienced employees to continue with and improve their service to the employer. Where a corporate sabbatical is granted for a specified sabbatical project (other than rest and recreation) one would have little trouble concluding that it is not vacation. The thornier problem is where the sabbatical is granted based only upon the length of service and is unconditional with regard to the employee's use of the time away. Such a program has elements in common with regular vacation. But it could still be a legitimate sabbatical if the facts show that the leave is designed as an incentive for continued and improved performance by the most experienced employees and not merely as a reward for a prior period of service.

In *Drumm v. Morningstar, Inc.* (N.D.Cal., Nov. 5, 2009, No. C08-03362 TEH) 2009 U.S.Dist. Lexis 108709, the federal district court accepted the DLSE test as setting forth the factors relevant to deciding whether a six-week sabbatical was actually regular vacation. In *Drumm*, under instructions patterned after the DLSE test, the jury found that the employer's sabbatical program was actually regular vacation. (*Id.* at pp. *3–*4.) The defendant moved for judgment as a matter of law (Fed. Rules Civ.Proc., rule 50, 28 U.S.C.), challenging the validity of the DLSE test. The district court denied the motion, stating, "The applicability of section 227.3 should hinge not on an employer's semantic choices, but on objective criteria. The DLSE adopted such criteria, requiring that a sabbatical be something more than a longer, less-frequent variant on vacation to avoid section 227.3. The DLSE's criteria have been in place for more than two decades, and employers are likely to have relied on its guidance with respect to their own time-off policies. As such, the Court did not err in instructing the jury based on the DLSE standards. Furthermore, whether Morningstar's policy fit the characteristics of a vacation was a question of fact that the Court properly allowed the jury to decide . . . ." (*Drumm v. Morningstar, Inc., supra*, at p. *16.)

Plaintiff urges us to follow *Drumm* and use the DLSE test to decide whether defendant's sabbatical policy is really vacation. Although neither the DLSE test nor the *Drumm* opinion is binding upon this court (see *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576 [59 Cal.Rptr.2d

186, 927 P.2d 296]; *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170]) we are not required to reject them. (See, e.g., *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 563 [67 Cal.Rptr.3d 468, 169 P.3d 889].) As we shall explain, the DLSE test, which employers have undoubtedly relied upon for many years, identifies three factors tending to show that a sabbatical program is not regular vacation. We will add a fourth.

First, leave that is granted infrequently tends to support the assertion that the leave is intended to retain experienced employees who have devoted a significant period of service to the employer. Every seven years is the traditional frequency and it seems an appropriate starting point for assessing corporate sabbaticals, as well. In many cases, an interval of seven years would be long enough for an employee to gain experience and demonstrate expertise that an employer might want to retain. Greater or lesser frequency could be appropriate depending upon the industry or particular company involved.

Second, the length of the leave should be adequate to achieve the employer's purpose. Since we are concerned here with unconditional sabbaticals given for the purpose of reenergizing the employee then, as the Labor Commissioner suggested, the length of the leave should be longer than that "normally" offered as vacation. Since regular vacation time may be used for rest, a sabbatical ought to provide the extended time off work that regular vacation does not.

Third, a legitimate sabbatical will always be granted in addition to regular vacation. And this point carries more weight when the regular vacation program is comparable in length to that offered by other employers in the relevant market. Because an employer could offer a minimal vacation plan and reward senior staff with sabbaticals as a way to avoid the financial liability of a more generous vacation plan, the employer's regular vacation policy should be comparable to the average vacation benefit offered in the relevant market.

A fourth factor is one that is implicit in the DLSE test but is not called out specifically. Since a sabbatical is designed to retain valued employees, then a legitimate sabbatical program should incorporate some feature that demonstrates that the employee taking the sabbatical is expected to return to work for the employer after the leave is over.

As to the nature of the employee to whom the sabbatical is offered, we are not persuaded that employers must limit sabbaticals to upper management or professional employees. Nor does it seem necessary to preclude offering

sabbaticals to all employees, or to all employees in a class. The fundamental question is whether the leave is compensation earned over the course of the employment, the enjoyment of which is deferred, or whether the leave is intended to retain the most experienced or valued employees and to enhance their future service to the employer. The rank or classification of the employee to whom the sabbatical is offered may or may not be relevant to that question. Indeed, any number of other factors could apply as well as the four we have set forth above. As the Labor Commissioner suggested when first confronting the question, "The point is that each case will have to be decided on its own facts."

### D. *Analysis*

We finally come to the facts of this case and the question whether defendant carried its burden of showing that one or more elements of the first cause of action cannot be established or that there is a complete defense to it. We conclude that defendant did not carry that burden.

As to the elements of plaintiff's wage claim, the undisputed evidence shows that defendant's sabbatical program contained the elements of a vacation. It was based upon the employee's length of service; if he worked seven (or five) years he was eligible for eight (or four) weeks off with pay. Although the program required that the employee bring his performance up to company standards before he could use the leave, and it allowed defendant to postpone a planned leave if it had business reasons for the postponement, the written policy does not impose any conditions upon earning the time off. Both the policy itself and the benefits brochure indicate that the employee was eligible after service for the prescribed number of years. The leave was granted without any conditions as to how the time was to be spent and did not require the employee to account in any manner for what he or she did while away.

As to defendant's claim that the leave was a legitimate sabbatical, defendant produced evidence to support that claim. The policy provides that employees on sabbatical "will return to their same job," which suggests that the program is designed as a retention incentive. But that feature alone is not dispositive. Although defendant asserted that the leave was also offered for a longer period than what was "normally" offered for vacation, and that it was not offered "too" frequently in that it was offered only every five or seven years, these are qualitative parameters upon which reasonable minds could differ. If a jury were presented with only the sabbatical and vacation policies, we cannot say that a reasonable jury would reach but one conclusion. It would not be unreasonable for a jury to decide that a four-week sabbatical is

not "normally" longer than vacation of four weeks, or that an eight-week sabbatical is not longer than that "normally" allowed for vacation where eight weeks equals the length of time an employee could be gone on vacation if he took the maximum amount he could accrue all at once. And, although we know that defendant also offered a vacation policy, we do not know how defendant's vacation policy compared to vacation benefits offered by defendant's competitors.

None of the other evidence defendant offered is dispositive, either. Evidence that defendant instituted the sabbatical policy to be competitive in the chip-design market does not help. Enhanced benefits of any kind would attract workers. The fact that management assigns others to take over the duties of an employee on sabbatical is not determinative. Any employer would want to plan in advance for an employee's extended absence, whether the absence was taken as a four-week sabbatical or a vacation. And limiting the sabbatical to salaried employees could suggest that the leave was actually just a way to give more highly compensated employees a more generous vacation plan.

The record contains little if any evidence of the context in which defendant decided to ·offer the sabbatical in the first place and none on what forces, internal or external, prompted it to modify the program after it was in operation for several years, or why, in the end, it abandoned it. All of this might have had some bearing upon the crucial factual question: What was the true purpose of the program?

Although the underlying facts, such as they are, are essentially undisputed, the ultimate fact to be determined is defendant's purpose in establishing its sabbatical policy. That is the central fact in dispute and the record before us does not resolve it conclusively. While there are facts to support a finding that the sabbatical was intended as incentive to induce experienced employees to continue working for defendant and increase their productivity or creativity upon return to work, reasonable minds could find, instead, that the leave was actually intended as additional vacation for longer term employees.

Because we cannot decide as a matter of law whether the eight-week leave is a sabbatical or is regular vacation, we need not reach the parties' contentions concerning the remaining causes of action, the ultimate determination of which will depend upon resolution of the central factual dispute.

## VII. *Disposition*[7]

The judgment is reversed. The parties shall bear their own costs on appeal.

Rushing, P. J., and Elia, J., concurred.

---

[7] Plaintiff has also argued that the trial court erred in refusing to hear his summary adjudication motion. Plaintiff had filed the motion too late to comply with the notice requirements of Code of Civil Procedure section 437c, subdivision (a) and the trial court ordered the motion off calendar. Plaintiff concedes that his motion repeated the arguments he made in opposition to defendant's motion. The reason for filing it, he says, was to use it "as a sword" and have the matter adjudicated in his favor without a trial. Given our conclusion that the issue cannot be decided as a matter of law, we need not further consider this argument. It is for that reason, as well, that we reject plaintiff's request that we remand with instructions to enter judgment in his favor.